[No. B009549. Second Dist., Div. Three. Feb. 26, 1987.]

DOWNEY SAVINGS AND LOAN ASSOCIATION, Plaintiff, Cross-defendant and Appellant, v.
OHIO CASUALTY INSURANCE COMPANY, Defendant, Cross-complainant and Appellant.

1074

## COUNSEL

Saphier & Rein, Michael S. Saphier and Richard A. Weisz for Plaintiff, Cross-defendant and Appellant.

George C. Montgomery, Bruce M. Thornton, Montgomery, Gascou, Gemmill & Thornton, Robert E. Jones, Gibson, Dunn & Crutcher, Theodore B. Olson and John J. Swenson for Defendant, Cross-complainant and Appellant.

## OPINION

**KENNARD, J.\***—Plaintiff Downey Savings and Loan Association (hereafter Downey) brought a bad faith action against defendant Ohio Casualty Insurance Company (hereafter Ohio) for denial of benefits under a fidelity bond issued by Ohio. A jury awarded Downey $152,983.43 in compensatory damages and $5 million in punitive damages. Downey appeals from that portion of the judgment denying it attorney's fees, while Ohio cross-appeals from the judgment against it. Reversed as to Downey's appeal.

### FACTS

Viewing the evidence in the light most favorable to Downey, as we must (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 511 [189 Cal.Rptr. 377, 658 P.2d 740]; *Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 618, fn. 2 [197 Cal.Rptr. 878]), the facts are as follows:

A. *Facts Relating to Downey's Claim Based on Employee Dishonesty*

On February 1, 1973, Ohio issued a "Savings and Loan Blanket Bond" to Downey. The bond provided coverage for losses caused by the dishonest act of any of Downey's employees, up to a maximum of $3 million. The bond

---

*Assigned by the Chairperson of the Judicial Council.

also promised to indemnify Downey for court costs and attorney's fees incurred by Downey in defending any lawsuit brought by a third party arising out of the dishonest acts of Downey's employees.

In late 1974, Steven Jones and Ronald Noday concocted a scheme whereby checks with insufficient funds would be used to buy certificates of deposit, which would then be pledged as security for loans from third-party lenders. The bad checks would be provided by Noday or his associates, Arthur Madison and William Beverly Smart. Having heard from his brother-in-law that Dennis McGrew, manager of Downey's branch in Rolling Hills, might be interested in making "some extra money," Jones invited McGrew to Noday's house in Palos Verdes on October 31, 1974. After a six-hour meeting, McGrew agreed to participate.

On December 11, 1974, McGrew wrote to the Bank of America in Sacramento that Madison and Noday were valued clients of Downey's and could place large certificates of deposit, up to a total of $1 million, with the Bank of America. Though McGrew's signature was on the letter, it had been drafted by Madison. Also, neither Noday nor Madison had an account with Downey.

On December 31, 1974, Noday obtained a check for $100,000 from Madison to open an account at Downey's Rolling Hills branch office in the name of Laurence A. Smith, Jr. There were insufficient funds to cover the check, a fact known to McGrew. Three days later, Noday opened another account at Downey's Rolling Hills branch, this time in his name, with a check for $220,000 drawn on a bank in the Bahamas, whose president was a friend of Noday's. This too was a bad check, and McGrew knew this.

In early January 1975, Noday and his associates applied to American Funding for a loan to CTR Leasing Company, which was controlled by Smart, pledging the $100,000 Smith account at Downey's as collateral. In response to a telephone call from an American Funding employee, McGrew verified the existence of the $100,000 certificate of deposit, even though he already knew the check had been dishonored because it was drawn on a closed account. The American Funding employee also made an appointment to see McGrew later that day to have him sign an assignment of the account. McGrew specifically mentioned to his assistant, Linda Johnson, that he had to sign an assignment that afternoon. As part of the plan worked out with Noday and Jones, however, McGrew left for lunch at 3 p.m., before the arrival of the American Funding employee. When the latter arrived at the bank and found that McGrew was not there, she became upset, saying she had an appointment with him. Assistant manager Linda Johnson signed the

assignment. Later McGrew told Jones everything had worked out as planned and since he did not sign the assignment he would not be directly connected with it.

Upon McGrew's return to the bank later in the day, Johnson showed him a copy of the assignment she had signed. The document stated there were no liens, holds or encumbrances on the Smith account, and certified that the account was fully insured. McGrew knew this information to be false, but he did not notify American Funding or anyone at Downey's thereof. Relying on the signed assignment, American Funding issued Smart a cashier's check for $100,000 in the late afternoon of January 8, 1975. The check was cashed the next day.

In late January 1975, Noday tried to obtain a second loan from American Funding by pledging his $220,000 account at Downey's as collateral. The chief executive officer at American Funding, A. Gordon Elder, became suspicious when he noticed that the assignment executed by Downey did not contain the name of the assignee. He paid a visit to Richard Bond, vice-president at Downey's main office in Downey, and asked if it was Downey's practice to leave the name of the assignee blank. When Bond replied it was not, Elder showed him the assignment of the $220,000 account. Elder also showed Bond the assignment of the $100,000 account and asked about its validity, adding he had already made a loan on the $100,000 but not on the $220,000 account. When Bond discovered a zero balance on the $100,000 account, he told Elder he would have to do some further checking and would telephone him later, but that the $220,000 assignment was not valid and would not be honored by Downey.

Unable to collect on the $100,000 loan to the company controlled by Smart, American Funding sued Downey. Downey requested Ohio to pay its attorney's fees in defending the American Funding lawsuit, but Ohio refused to do so, claiming no liability under the fidelity bond it had issued to Downey.

## B. *Facts Relating to Ohio's Bad Faith*

John H. Rehm, Jr., assistant vice-president at Ohio and its superintendent of the bond claims department at Ohio, supervised all of Ohio's bond claims on a nationwide basis. He also wrote Section 18 of Ohio's claims manual setting forth the standards for the handling of bond claims. Those standards were consistent with the standards of the insurance industry, and included the following: (1) upon receipt of notice of any occurrence, the underwriter was to immediately refer the matter to the claims department; (2) if review

by the claims department indicated the possibility of a claim, an adjuster was to be assigned immediately and an investigation commenced forthwith, requiring contact with the insured within 24 hours after an adjuster's assignment, and prompt contact with the allegedly dishonest employee.

On January 31, 1975, within 48 hours after the meeting between Downey's Bond and American Funding's Elder, Downey notified Ohio of the circumstances surrounding the $100,000 and $220,000 transactions. A second notice to Ohio was given on February 3, 1975. Ohio, however, took no action and did not refer the matter to its claims department, even though it knew of Downey's belief that an "inside man" was involved.

On February 28, 1975, Downey's Bond wrote a letter to Judith Nye, the insurance agent for Ohio, mentioning McGrew's representation to the American Funding employee that he would sign the assignment of the $100,000 account, even though McGrew had learned the previous day that the $100,000 check used to open the account at Downey had been dishonored. It was not until May 19, 1975, that Ohio's claims department received the February 28, 1975, letter. Robert Shafer, manager of Ohio's claims department, sent a copy of the letter to Rehm with the notation, "questioning possible fraud or embezzlement." Shafer also sent Rehm a letter from Nye stating that McGrew was no longer employed by Downey. Shafer assigned the matter to adjuster Robert Jones for investigation.

On May 23, 1975, Rehm wrote Shafer a memorandum in which he acknowledged the possibility of employee dishonesty but warned Shafer not to waive any defenses under the bond. Rehm then assigned a claim number to the matter, and established a reserve, that is, an estimate of the value of the claim. No attempt was made to interview any of the persons involved in the transaction. Ohio's first contact with Downey was by letter dated May 29, 1975, stating that Ohio did not receive notice of the transaction until May 19, 1975. Rehm admitted in court that Ohio was given notice on January 31 and February 3, 1975, but that Ohio used the May 19, 1975 date to set up its defense of late notice under the bond. Rehm also said he knew the letter contained false information, but that he did nothing to correct it.

A copy of Ohio's May 29, 1975, letter to Downey was sent to Judith Nye. She immediately called Shafer, telling him the May 19, 1975, date was incorrect since she had personally notified Ohio in late January and early February 1975 of the incident. Shafer told Nye, "Don't worry about it. It is just a form letter. It goes to everybody."

In late July 1975, Ohio conducted a 20-minute interview with Richard Bond. A memorandum of the interview was written on August 27, 1975, and

a copy was sent to Rehm. Rehm testified that after reading the results of the investigation, he suspected McGrew's involvement in both the $100,000 and $220,000 transactions, but he never instructed anyone at Ohio to interview McGrew, even though he realized such an interview was necessary to complete Ohio's investigation. On September 5, 1975, Rehm wrote a memorandum to the claims department to keep "all possible defenses in the forefront" of the investigation.

After receiving Rehm's letter, claims adjuster Robert Jones on September 9, 1975, talked to Helmut Bauer, an investigator for the major frauds division of the district attorney's office, about the McGrew incidents involving the $100,000 and $220,000 checks. The interview lasted 10 minutes. Thereafter, Jones wrote a memorandum stating that Bauer had told him of McGrew's innocence in the scheme. Bauer, however, denied making such a statement.

In early February 1976, Rehm received a copy of American Funding's complaint against Downey. He recognized the possibility of McGrew's dishonesty with respect to the $100,000 transaction and the potential for liability under the bond. Still he saw no need to interview McGrew or anyone else involved with the transaction.

After his indictment, Steven Jones entered into a plea bargain with the district attorney. At the trial, he directly implicated McGrew. A transcript of Jones's testimony was forwarded to Ohio on October 31, 1977. Upon review of the transcript, Rehm concluded that if Jones had testified truthfully, McGrew's conduct would be covered as a dishonest act under the bond. But Rehm did not believe Jones's testimony, taking the position there would be coverage under the bond only if McGrew made a confession or admission of guilt. Rehm nevertheless concluded in an internal memorandum that since "employee dishonesty could grow out of these facts," the establishment of a $25,000 reserve was called for as a precautionary measure. Ohio notified Downey there was no coverage under the bond, and hence no liability for Downey's costs and attorney's fees incurred in the American Funding lawsuit.

On November 21, 1978, Downey sued Ohio for indemnity, declaratory relief, and interference with a protected property interest. The complaint was later amended to allege a cause of action for breach of the implied covenant of good faith and fair dealing. Downey alleged as part of its damages court costs and attorney's fees it already had incurred and would be incurring in the action.

On July 23, 1980, Ohio took McGrew's deposition. In November 1980, American Funding moved for summary judgment against Downey. The motion described McGrew's involvement in the scheme to defraud Downey. Downey sent a copy of the motion to Ohio. Ohio maintained there was no coverage under the bond.

In late 1983, trial commenced in this case.

## ISSUE ON DOWNEY'S APPEAL

The sole issue raised by Downey on appeal involves the propriety of the trial court's ruling denying Downey to recover as part of its damages attorney's fees and court costs incurred in its bad faith action against Ohio.

## ISSUES ON OHIO'S CROSS-APPEAL

On the cross-appeal by Ohio, we are asked to determine the propriety of (1) the trial court's denial of Ohio's motion to have the bad faith action tried separately from the other issues, (2) the trial court's summary adjudication of certain issues, (3) the trial court's rulings on certain evidentiary issues, (4) the trial court's instructions to the jury, and (5) the jury's award of punitive damages based on its finding that Ohio acted in bad faith towards Downey.

## DISCUSSION

## I. DOWNEY'S APPEAL

On September 14, 1983, prior to trial in the case at bench, the court granted Downey's motion to have the issue of attorney fees on the bad faith action tried after the jury's verdict on the other issues. On November 21, 1983, the court granted Ohio's motion barring Downey from introducing evidence on the issue of costs and attorney's fees incurred in Downey's bad faith action against Ohio. The court then ruled that Downey's attorney fees were "not a recoverable item of damages."

Citing *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], Downey contends the court's ruling was improper. We agree. In *Brandt,* the state Supreme Court held that when an insurer tortiously withholds benefits, the insured is entitled to recover attorney's fees incurred to compel payment of the policy benefits. As the court said, "The attorney's fees are an economic loss—damages—proximately caused by the tort." (*Id.,* at p. 817.)

We conclude the trial court's ruling was improper. (*White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 890 [221 Cal.Rptr. 509, 710 P.2d 309]; *Brandt* v. *Superior Court, supra,* 37 Cal.3d 813, 819.) The matter is reversed and remanded for a determination of the attorney's fees to which Downey is entitled under *Brandt.*

## II. OHIO'S CROSS-APPEAL

### A. DENIAL OF BIFURCATION OF TRIAL

■ Ohio contends the trial court committed reversible error in denying Ohio's request to have Downey's cause of action for breach of the implied covenant of good faith and fair dealing tried separately from the issue of liability under the bond.

■ Whether there shall be a severance and separate trials on issues in a single action is a matter within the discretion of the trial court, whose ruling will not be disturbed on appeal absent a manifest abuse of discretion. (*McArthur* v. *Shaffer* (1943) 59 Cal.App.2d 724, 727 [139 P.2d 959].) ■ In denying the motion for severance, the trial court noted that the evidence on the issue of Ohio's bad faith was interrelated with the issue of coverage under the bond, that the issues were not "that complex," and that it had "great confidence in the ability of the jury to follow the court's instructions." We find nothing in this case that compels a conclusion of an abuse of discretion by the trial court in denying the motion for severance. (*McArthur* v. *Shaffer, supra,* at pp. 727-728.) Nor do we find merit in Ohio's claim the trial court's ruling "substantially tilted the scales in favor of Downey."

### B. PROPRIETY OF SUMMARY ADJUDICATION OF CERTAIN ISSUES

Code of Civil Procedure section 437c, subdivision (f) provides that when a party moves for summary adjudication of issues, and it appears that the evidence supports the granting of the motion, the court shall issue an order specifying that such "issues are without substantial controversy." The action then proceeds as to the remaining issues. ■ "The purpose of a partial summary judgment is to dispose of one or more issues before trial so that the parties may focus on the questions remaining." (*Conway* v. *Bughouse, Inc.* (1980) 105 Cal.App.3d 194, 202 [164 Cal.Rptr. 585].) ■ Summary judgment is proper if no material factual issue exists. (*Avila* v. *Standard Oil Co.* (1985) 167 Cal.App.3d 441, 446 [213 Cal.Rptr. 314].) ■ Our review is limited to the facts shown in the documents presented to the trial court in making our independent determination of their construction and effect

as a matter of law. (*Bonus-Built, Inc.* v. *United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].)

### 1. *Indemnification of Attorney's Fees*

The bond provided coverage for any loss incurred as a result of dishonest or fraudulent acts of any of Downey's employees. Under the bond, Ohio had the option of defending Downey or indemnifying it for court costs and attorney's fees incurred in the defense of a third-party lawsuit to enforce the insured's liability for any loss suffered by the third party which, "if established against the Insured, would constitute a valid and collectible [*sic*] loss sustained by the Insured under the terms of the bond." The trial court summarily adjudicated that under the bond Ohio was liable for costs and attorney's fees Downey incurred in its defense against American Funding's complaint. The court ruled that such liability started on October 31, 1977, the date on which Downey sent Ohio a transcript of the testimony of Steven Duane Jones implicating McGrew. Ohio contends the summary adjudication was improper because the American Funding complaint filed against Ohio contained no allegation of employee dishonesty.

The documentary evidence before the trial court showed the following: Starting in late January 1975, and continuing thereafter, Downey notified Ohio of the incidents involving McGrew and its suspicions of the latter's dishonesty in those matters. On October 31, 1977, Downey sent Ohio a transcript of the testimony given by Steven Jones at the American Funding trial implicating McGrew in the scheme to defraud Downey. After receipt thereof, Ohio acknowledged in an internal memorandum written on November 28, 1977, that "employee dishonesty could grow out of these facts," calling for the establishment of a reserve of $25,000 as a precautionary measure. In subsequent letters to Downey, however, Ohio maintained there was no coverage under the bond and thus no duty on the part of Ohio to defend or indemnify Downey for its attorney fees and court costs incurred in the American Funding lawsuit. Ohio took the position that the complaint by American Funding contained no allegation of employee dishonesty, and therefore there was no liability under the bond.

At the hearing on summary adjudication of the issue of indemnification of attorneys fees incurred in the lawsuit filed by American Funding, Ohio argued it doubted the truthfulness of Jones's testimony and summary adjudication would therefore be improper. In granting summary adjudication, the trial court said: "The undisputed documentary evidence shows that by October 31, 1977, a witness had testified to fraudulent or dishonest acts on the part of a Downey employee, McGrew, and that Ohio, on or about that

date was made aware of that testimony. It is not a true issue here, and hence is irrelevant to determination of this motion, whether the testimony of that witness (Jones) was or was not true. What is important is that clearly by this date Ohio was aware of facts claimed to exist which showed a potential liability on the part of Downey (*Gray* v. *Zurich, etc.,* 1966, 65 C.2d 263, 276)."

Whether American Funding's complaint contained allegations that its claim against Downey was of the nature covered by the bond issued to Downey by Ohio, or whether Ohio disbelieved the testimony of Jones directly implicating McGrew in the scheme to defraud Downey, was irrelevant, and the trial court properly so found. ■ "Inadequate allegations of a third party's complaint are not determinative of an insurer's obligation to defend if the insurer learns from the insured or other sources facts which give rise to the potential of liability under its policy." (*Hartford Accident & Indem. Co.* v. *Civil Service Employees Ins. Co.* (1973) 33 Cal.App.3d 26, 34 [108 Cal.Rptr. 737]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276-277 [54 Cal.Rptr. 104, 419 P.2d 168]; *CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 607 [222 Cal.Rptr. 276].)

### 2. *The Bond's Requirements of Notice of Loss and Proof of Loss*

■ Ohio contends the trial court erred in granting summary adjudication against Ohio on its affirmative defense that Downey had failed to comply with the bond's requirements of notice of loss and proof of loss. The bond required Downey to furnish Ohio with a written notice of loss at "the earliest practicable moment after discovery of any loss," and to supply proof of loss within six months of the discovery of the loss. In granting summary adjudication on this issue, the trial court said: "This defense relates to a claimed failure by Downey to give written notice of loss at the earliest practicable moment and within six months. No facts of prejudice to Ohio are shown and it is affirmatively shown that Ohio executives have testified that there was not prejudice. In the absence of prejudice an insurer may not rely on a breach of a notice clause. (*Campbell* v. *Allstate Insurance Co.* (1963) 60 Cal.2d 303, 306 [32 Cal.Rptr. 827, 384 P.2d 155].) Further, having denied liability, Ohio waived any claim of noncompliance with the provisions. (*Walters* v. *American Insurance Co.,* 1960, 185 CA.2d 776, 787 [8 Cal.Rptr. 665].)"

Ohio argues on appeal that in fidelity insurance prompt notice of loss is crucial because this enables the insurer to immediately investigate the matter and thereby avoid losses which would otherwise be irremediable. Time is especially of the essence, Ohio continues, in a case such as this which

involves embezzlement. Downey's response thereto is that since it did not suffer a loss until it paid American Funding $55,000 to settle the lawsuit, it could not have notified Ohio of the "loss" or furnished Ohio with a proof of the loss suffered prior to the settlement.[1] In support, Downey cites *Pacific-Southern Mortgage Trust Co.* v. *Insurance Co. of North America* (1985) 166 Cal.App.3d 703 [212 Cal.Rptr. 754]. There the court interpreted the term "discovery of the loss" under a bond to mean the time when the insured discovers it has suffered a *loss,* not the time when the insured discovers a *potential loss.* (*Id.,* at p. 711.) As the court said, "[I]t is logical to start the running of the bond's limitation period upon discovery of a real loss rather than discovery of an anticipated loss." (*Id.,* at p. 712.) Under *Pacific-Southern,* therefore, Downey did not suffer a loss until it settled the American Funding lawsuit for $55,000. Also, here the bond did not provide indemnity against liability, but indemnity against loss, and thus did not cover anticipated or even uncertain future losses but only actual losses. If Ohio had wanted written notice upon discovery of the fraud, it could have so stated in the bond. As the court in *Pacific-Southern* noted, some blanket fidelity bonds specifically require an insured to report " 'an occurrence which may give rise to a claim.' " (*Id.,* at p. 711.)

■ Moreover, though an insurer may assert a defense based upon an alleged breach of the notice requirements of the policy, the breach cannot be a valid defense unless the insurer was substantially prejudiced thereby. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 883-884 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Campbell* v. *Allstate Ins. Co.* (1963) 60 Cal.2d 303, 305 [32 Cal.Rptr. 827, 384 P.2d 155].) ■ Ohio has not made such a showing. The record shows that Ohio had adequate notice of *potential* liability to prevent any substantial prejudice to its interests. (*CNA Casualty of California* v. *Seaboard Surety Co., supra,* 176 Cal.App.3d 598, 617.) Furthermore, in denying liability under the bond, Ohio has waived any claim that Downey has not complied with the notice requirements of the bond. (*Ibid.*; *Walters* v. *American Ins. Co.* (1960) 185 Cal.App.2d 776, 787 [8 Cal.Rptr. 665].)

---

[1]There was correspondence between the parties during litigation of the American Funding lawsuit in which both parties expressed their understanding that Downey had not sustained a loss within the meaning of the bond. For instance, on March 17, 1976, Ohio wrote to Downey: "The insured, Downey Savings and Loan Association, has not sustained any loss as of this date by reason of the transaction alluded to in the complaint." And in November 1977, Downey's counsel sent this letter to Ohio's counsel: "It is Downey's understanding that since it has not yet sustained any loss except for its litigation costs, no proof of loss is required at the present time, and the provisions giving rise to the limitations in which the legal proceedings can be commenced for recovery of any loss would not come into play until the actual loss sustained by Downey has been determined. If this understanding is incorrect, we would ... appreciate your advising me[*sic*] immediately." Ohio did not advise Downey to the contrary.

### 3. Ohio's Cross-complaint Against Downey Alleging Breach of Duty of Good Faith

In its cross-complaint, Ohio alleged that Downey had breached its duty of good faith owed to Ohio by failing to comply with the bond's provisions regarding notice and proof of loss, by not cooperating in the investigation of the claim, and by attempting to create coverage under the bond "falsely accusing McGrew of fraud." On appeal, Ohio argues the trial court's ruling was erroneous because the court "improperly refused to consider all affidavits presented," and the evidence was "wholly insufficient to negate a triable issue of fact." **(11)** These contentions are supported by neither argument nor citation of authority; they are therefore deemed abandoned. (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 710 [152 Cal.Rptr. 65].) A reviewing court need not consider alleged error when the appellant merely complains of it without pertinent argument. (*Ibid.*) Moreover, having considered Downey's response to this issue on pages 66 through 68 of its cross-respondent's brief, we are convinced the trial court's summary adjudication was proper.

### C. PROPRIETY OF TRIAL COURT'S EVIDENTIARY RULINGS

### 1. Admissibility of Testimony by Jones About His Conversation With Noday

■ Over Ohio's objection on the ground of hearsay, the trial court admitted the testimony of Duane Jones regarding a conversation he had with Noday in which Noday related the following: On February 12, 1975, he went to Downey's branch office in Rolling Hills to redeem the $100,000 check for cash he was carrying in a briefcase. The briefcase was filled half with money, half with paper. While the money was being counted, someone (Jones did not recall whether Noday said it was McGrew) said the check was not at the bank. Upon hearing that, Noday immediately closed his briefcase, saying if the check was not there he was not going to hand over the money. Noday told Jones the interruption came at the right moment because he simply did not have sufficient cash with him. He had no intention of redeeming the check, he simply wanted to give the appearance of redeeming the check.

The trial court admitted the testimony on the basis of a coconspirator's statement under Evidence Code section 1223.

The conspiracy in this case included not only the illegal bank transactions but also the payment by Noday to Jones of a "finder's fee" for bringing McGrew into the conspiracy and a payment of 10 percent for every transac-

tion going through Downey's. Jones, however, did not find out until the end of 1975 that in early January 1976 Noday had obtained a loan from American Funding based on the $100,000 certificate of deposit with Downey's, which was backed by a "bad" check. Jones testified he felt he should have been paid his "commission" for the transaction, and he was upset that no payment had been made to him.

Statements of conspirators made after commission of the crime which was the object of the conspiracy are admissible if the evidence shows that the conspiracy also contemplated payment of a certain sum to an accessory for his participation in the crime. As said in *People* v. *Ross* (1941) 46 Cal.App.2d 385, 396 [116 P.2d 81], " 'When a conspiracy discloses an intention to divide property stolen, evidence of acts and declarations at any time before the division are admitted upon the theory the conspiracy does not end until that time.' " We conclude the trial court's admission of the challenged testimony in this case was proper.

2. *Exclusion of Jones's Letter of October 25, 1983*

Ohio sought to introduce into evidence a letter Jones had written to Downey's counsel stating he had met with two of Ohio's attorneys and expressing his opinion that Noday could have used McGrew without the latter knowing it. Downey objected on the ground that Jones's opinion was purely speculative, and the trial court agreed. Ohio contends the letter should have been admitted because of its relevance to "unfounded accusations of misconduct by Ohio's counsel." We have reviewed the letter. Since it contains nothing which explains or elaborates on the conduct of Ohio's counsel, we fail to see its relevance in this regard.

Ohio argues the letter should have been admitted under Evidence Code section 356. That section provides in relevant part that when part of a writing "is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party." Here, Downey never offered any portion of the letter into evidence. It was Ohio who sought to admit the entire letter. Ohio's reliance on Evidence Code section 356 is misplaced.

3. *Admission of Richard Bond's Testimony That Downey Terminated McGrew Because of His Alleged Dishonesty*

██ Over Ohio's objections on the grounds of irrelevancy and speculation, the trial court allowed Richard Bond, vice-president of Downey, to testify that he terminated McGrew because the latter had violated the bank's policy regarding assignments and because of the bank's suspicion of his

involvement in the Noday transactions. The trial court's ruling was proper. The evidence was relevant as to Downey's bad faith claim that Ohio had conducted an inadequate investigation for failure, among other things, of finding out the reason for McGrew's termination. An internal memorandum written by Ohio's Rehm mentioned that coverage under the bond would extend only to employee dishonesty, that he thought the facts presented to him indicated stupidity rather than dishonesty by any employee of Downey's, but then went on to say that "there may be some inuendo[*sic*] in the facts as we now have them of employee dishonesty since Mr. McGrew, former branch manager of the Savings & Loan is no longer employed by them." Despite Ohio's awareness of possible employee dishonesty, Ohio nevertheless failed to inquire of Bond, Downey's vice-president, as to the reason for McGrew's termination.

Ohio also contends the trial court erred in sustaining Downey's objection to Ohio's question of Olga Mitchell, a teller at Downey's, whether she believed McGrew had committed any fraudulent acts. Mitchell's involvement in the transaction involving Noday was limited to counting the money Noday had brought in a briefcase. Any opinion of hers would have been purely speculative on the issue of McGrew's dishonesty. The trial court's ruling was therefore proper.

### 4. *Exclusion of Character Testimony to Impeach Richard Bond*

■ Bond denied receiving a telephone call from McGrew on either January 8 or 9, 1975, about the Smith assignment. He also testified he had no recollection of having met any of Ohio's representatives. Ohio attempted to attack Bond's character traits for honesty through the testimony of Stanley Pawlowski and Edward Lemoyne, employees of El Camino Bank, based on an alleged "check kiting" scheme which involved McGrew and occurred years after the McGrew incidents and after Bond had left Downey. In exercising its discretion under Evidence Code section 352 and sustaining Downey's objection to the proffered testimony, the trial court ruled that the probative value was slight and "likely to confuse" the jurors. As the court noted, "I realize that he was in charge at one point, but he has got a minimal memory and he can't dispute the memorandums [*sic*] where they exist. They are there. They were directed to him. . . . [¶] It just seems that the fact that he got in some trouble later on really isn't all that significant. Nothing was ever prosecuted. . . . [¶] The fact that . . . his reputation in the minds of some people is rather negative . . . I think is likely to confuse the issue."

Except for proof of a felony conviction, specific instances of wrongdoing are not a proper basis for attacking a witness's credibility. (Evid. Code,

§§ 787, 788; *Vick* v. *Patterson* (1958) 158 Cal.App.2d 414, 416 [322 P.2d 548].) Here, there was no felony conviction. Bond's alleged involvement in a "check kiting" scheme years after the McGrew incidents did not lead to a criminal prosecution.

We find no abuse of discretion in the exclusion of the proposed testimony. (*Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 36 [161 Cal.Rptr. 516].)

### 5. *Exclusion of Certain Correspondence Between Counsel for Both Parties*

■■ Ohio contends the court erred in excluding certain correspondence between counsel for both parties in the course of litigating this case. Ohio argues such correspondence, which consisted of seven letters, was relevant because it showed a lack of cooperation by Downey in assisting Ohio with its investigation. Though Ohio has cited us to the pages in the clerk's transcript where these letters appear, it has failed to cite us to the appropriate pages in the reporter's transcript showing the trial court's ruling and the basis for it. In this case, the reporter's transcript has 26 volumes totaling 3,868 pages, with the clerk's transcript containing 19 volumes totaling 7,077 pages. A reviewing court cannot be expected to search through a voluminous record on a point raised by an appellant when his brief makes no reference to the pages where the issue was raised in the trial court. (*Metzenbaum* v. *Metzenbaum* (1950) 96 Cal.App.2d 197, 199 [214 P.2d 603].)

In any event, our review of the letters convinces us their exclusion was proper. The letters pertained to Ohio's pretrial discovery and preparation of a defense in the lawsuit brought by Downey. They did not constitute an investigation by Ohio into Downey's insurance claim. Therefore, they were only marginally relevant.

We reject Ohio's contention that the excluded evidence was admissible in the discretion of the trial court under Evidence Code section 352. To be admissible, the evidence had to be relevant (Evid. Code, § 350; *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853 [139 Cal.Rptr. 888, 93 A.L.R.3d 537].) This test was not met here.

### 6. *Exclusion of Purported Credit Report on American Funding*

■■ Ohio claims the trial court erred in excluding a purported credit report on American Funding, which was found in one of Downey's files during discovery proceedings. Ohio cites us to page 6881 of the clerk's transcript where this report is duplicated. That page shows an illegible copy. Anyway, we find no error in the trial court's exclusion. When Ohio showed

the document to Richard Bond (Downey's vice-president) and questioned him about it, Bond replied he knew nothing about the document, he had never seen it before, and he did not know how it found its way into Downey's file, adding that a number of Downey employees had access to the file. The trial court sustained Downey's objection to the document's admission into evidence on the grounds of lack of foundation and failure to authenticate the document. Without citation of authority, Ohio contends Downey had the burden of authenticating the document. Since Ohio was the proponent of the evidence, it had the burden of complying with the authentication requirements of Evidence Code section 1410.

### 7. *Exclusion of Lie Detector Test Results*

John Rehm (superintendent of Ohio's bond claims department) testified that during its investigation of the McGrew incident Ohio never asked McGrew to submit to a lie detector test, doing so only on the eve of trial (eight years after the McGrew incident and almost five years after Downey's filing of the lawsuit against Ohio). Ohio did not object. It now claims that since Downey did bring up the fact that McGrew submitted to a lie detector test at Ohio's request, the trial court erred in not allowing Ohio to argue to the jury the results of the test.

The test results were never brought up in the course of the trial. Nor did a qualified witness testify as to the procedures used in administering the test. The only witness who testified regarding the taking of a polygraph test by McGrew was Downey's employee, John Rehm. Also, as the trial court noted, the probative force of the polygraph examination was diminished by the long lapse of time between the occurrence of the events and the taking of the test. The trial court did not err in not allowing Ohio to argue to the jury the results of the polygraph test taken by McGrew. (*United States* v. *Demma* (9th Cir. 1975) 523 F.2d 981, 987.)

### D. JURY INSTRUCTIONS

At a hearing outside the jury's presence the trial court discussed proposed jury instructions with both counsel. Ohio argued that any obligation it had towards Downey under the bond was exonerated when Downey refused to accept Noday's tender of $100,000 on February 12, 1975, and that the court should so instruct the jury. In refusing to do so, the court noted that although a plaintiff has a duty to "use reasonable efforts to mitigate his damages," there was insufficient evidence of a tender by Noday and insufficient evidence "to go to a jury that Downey was negligent in not taking the money from Mr. Noday."

The pertinent evidence is as follows: On February 12, 1975, Noday appeared at Downey's Rolling Hills branch office without an appointment. He carried a briefcase, which contained cash on top and paper underneath. He said he wanted to exchange $100,000 in cash for the Smith check he had deposited at an earlier date. While the money was being counted, Noday was told the check was not there. Noday immediately placed the money back in the briefcase, closed it and, saying he would not leave the money without getting the check back, left immediately. He later told Jones the bank's statement that the check was not there came just in time because he did not have all of the required cash with him, having filled his briefcase with half cash, half paper.

We agree with the trial court that under the circumstances there was no valid tender. As the trial court said, "I accept Mr. Steven Jones' testimony that Noday made this as a show without any intention of performing." Also, having conceded in the trial court there was no tender, Ohio may not now be heard to complain there was a proper tender.

■ After conceding there was no tender, Ohio argued that Downey's conduct in this regard constituted negligence. In rejecting the contention, the court said, "Now, after thinking about it and thinking about it, I can't say that there is any reasonable interpretation of this evidence that would show that Downey was negligent. . . . They were on the horns of a dilemma, a catch-22 situation, they hadn't actually experienced a loss yet, there was certainly an exposure, Noday wasn't asking for his own check, he was asking for Smith's check, he was making this big show with this cash. And, yet, he was very impatient, he wasn't going to sit there and wait for a day or two to go back, we know that for them to get a check from wherever it might have been out there to Rolling Hills. [¶] So I'm—my conclusion is there isn't enough to go to the jury on that issue." We cannot say the trial court erred in this regard.

Moreover, even if Downey's conduct constituted negligence, it would not have exonerated Ohio. Insurance Code section 533 provides that an insurer "is not exonerated by the negligence of the insured, or of the insured's agents or others." (See also *Pellas* v. *Ocean Acc. & Guar. Corp.* (1938) 24 Cal.App.2d 528, 535 [75 P.2d 635], which held that negligence by the insured did not preclude coverage under a fidelity bond.)

Buried in Ohio's argument on the impropriety of the punitive damage award, which appears as Argument VI in Ohio's opening brief on its cross-appeal, are a number of contentions attacking certain jury instructions. We find no reversible error.

### E. PUNITIVE DAMAGES

#### 1. *Sufficiency of Evidence to Support Punitive Damage Award*

Ohio claims there is no evidentiary support for the jury's finding that it acted maliciously and in bad faith towards Downey, and thus the jury's award of punitive damages was inappropriate.

On this appeal, we are governed by the familiar substantial-evidence test of *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427 [45 P.2d 183].) Thus, any conflicts in the evidence must be resolved in favor of the respondent, "and all legitimate and reasonable inferences indulged in to uphold the verdict if possible." (*Id.,* at p. 429.) When a verdict is attacked as being unsupported, the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the jury's conclusion. (*Ibid.*) Also, when two or more inferences can be reasonably deduced from the facts, the reviewing court may not substitute its deductions for those of the trier of fact. (*Ibid.*) Determinations as to the assessment of punitive damages have traditionally been left to the discretion of the jury. Here, the propriety of punitive damages was also reviewed by the trial court when it rejected Ohio's motion for a new trial and motion for judgment notwithstanding the verdict. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 821 [169 Cal.Rptr. 691, 620 P.2d 141].)

The law implies a convenant of good faith and fair dealing in every insurance contract. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032].) Therefore, when an insurer unreasonably and in bad faith withholds payment on a claim of its insured, it is subject to liability in tort. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 818.) An insurer may also breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claim. (*Id.,* at p. 817.) Under this implied promise, in determining whether to settle a claim, the insurer must give "at least as much consideration to the welfare of its insured as it gives to its own interests." (*Id.,* at p. 818.)

Civil Code section 3294 provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Though there has been criticism of the concept of punitive damages, the courts in this state have consistently upheld the constitutionality of the punitive-damage statute. (*Egan* v. *Mutual of Omaha*

*Ins. Co., supra,* 24 Cal.3d 809, 819.) ■■■ As the state Supreme Court noted in *Egan*: " 'The insurers' obligations are . . . rooted in their status as purveyors of a vital service labeled quasi-public in nature. . . . The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust.' [Citation.]" The court continued: "Furthermore, the relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position. The availability of punitive damages is thus compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship. [Citations.]" (*Id.,* at p. 820.)

■■■ Our review of the evidence, which we discussed in detail in our summary of the facts earlier in this opinion, convinces us there was substantial evidence from which the jury could reasonably have found that Ohio "acted maliciously, with an intent to oppress, and in conscious disregard of the rights of its insured," thus entitling Downey to punitive damages. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 923 [148 Cal.Rptr. 389, 582 P.2d 980].)

### 2. *Excessiveness of Punitive Damage Award*

■■■ Ohio contends the punitive damages are excessive. We examine the evidence on this issue in the light most favorable to the judgment. (*Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 636 [197 Cal.Rptr. 878]; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 819 [174 Cal.Rptr. 348].)

The jury awarded Downey $152,983.43 in compensatory damages and $5 million in punitive damages. Calculating the ratio between the punitive and compensatory damages to be 32.7 to 1, Ohio argues the punitive damages are disproportionate to the compensatory damages.

■■■ There is no fixed ratio to determine the proper proportion between punitive and compensatory damages. (*Moore* v. *American United Life Ins. Co., supra,* 150 Cal.App.3d 610, 636; *Rosener* v. *Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740, 751 [168 Cal.Rptr. 237].) The calculation of punitive damages involves, instead, "a fluid process of adding or subtracting depending on the nature of the acts and the effect on the parties and the worth of the defendants," and in this regard juries have a wide discretion in determining what is proper. (*Walker* v. *Signal Companies, Inc.* (1978) 84

Cal.App.3d 982, 998 [149 Cal.Rptr. 119]; *Devlin* v. *Kearny Mesa AMC/Jeep/ Renault, Inc.* (1984) 155 Cal.App.3d 381, 390 [202 Cal.Rptr. 204].)

An examination of cases involving a high ratio between punitive and compensatory damages shows that the punitive damage award in this case is not excessive as a matter of law. Thus, in *Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 165 [217 P.2d 19], the court upheld a punitive damage award of $2,000 where the compensatory damages award was $1, a ratio of 2000 to 1. In *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, the punitive damages awarded were $739,500 and the compensatory damages were $9,500, a ratio of 78:1, which was upheld by the state Supreme Court. And in *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86 [178 Cal.Rptr. 831], the court upheld an award of $200,000 in punitive damages and $5,146.71 in compensatory damages, a ratio of about 40:1.

"The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928, fn. 13.) The more reprehensible the act, the greater the appropriate punishment. (*Ibid.*) If, as Ohio appears to argue, the overriding consideration in an award of punitive damages is whether it bears a reasonable relationship to the actual damages suffered, the result may thwart the purpose of punitive damages. (*Id.,* at p. 928, fn. 13.) Where, for instance, a defendant's conduct is especially wanton or malicious but the plaintiff's actual damages are low, rigid reliance on the "reasonable relationship" rule would limit the punitive damages to an amount not disproportionate to the actual damages. Such application would in effect ignore the punitive and deterrent functions of exemplary damages. In that situation, a large award of punitive damages would be necessary to ensure that the defendant does not repeat his act and that others do not follow his example. (*Moore* v. *American United Life Ins. Co., supra,* 150 Cal.App.3d 610, 637.)

We will not assume that the jury's award of punitive damages was solely to punish Ohio for its reprehensible conduct towards Downey. The jury could also have intended to punish Ohio for its invidious practices. (See *Moore* v. *American United Life Ins. Co., supra,* 150 Cal.App.3d 610, 637.) In this regard, we note it was "standard procedure" for Ohio to instruct its claims adjusters to keep defenses "in the forefront" of the investigation. This was in direct violation of Ohio's duty as an insurer "to give the interests of the insured at least as much consideration as it gives to its own interests." (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 460 [113 Cal.Rptr. 711, 521 P.2d 1103].) Ohio's own expert testified it was improper to have the investigation focus on the development of facts which would support the

insurer's defenses. We also note that Ohio's claims manual instructed its claims personnel to create a "climate for settlement" through the use of depositions "to cause harassment, embarrassment, inconvenience or expense." Here, Ohio scheduled 18 depositions near the time of the mandatory settlement conference set for August 17, 1983.

Since the jury in this case could have reasonably intended to punish Ohio not only for its reprehensible conduct towards Downey but also for its invidious practices, thereby discouraging a repeat thereof, we give the ratio of punitive to compensatory damages little weight. (*Moore* v. *American United Life Ins. Co., supra,* 150 Cal.App.3d 610, 637.)

■ An award of punitive damages will be reversed as excessive only when the entire record viewed most favorably to the judgment indicates the award was the result of passion and prejudice. (*Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 997 [149 Cal.Rptr. 119].) For instance, in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, the court reversed a punitive damage award of 40 times the actual damages of $123,000 on the ground that it was the result of passion and prejudice by the jury towards the plaintiff insured who sued under an individual disability policy. Also, there the award represented 2½ months of the insurer's net annual income, and more than 7 months of its annual income. ■ Unlike the disabled plaintiff in *Egan,* the plaintiff here was not one to arouse the jury's sympathy. In his argument to the jury, Ohio's counsel described Downey as a financially solvent corporate plaintiff with substantial assets. It must be inferred, therefore, that the jury's verdict was not motivated by sympathy for the economic plight of the plaintiff. The trial court's finding, in its denial of Ohio's motion for a new trial, that the jury's award was free from any passion or prejudice and was the product of a "sober" jury further confirms the conclusion that the award was the product of calm and careful deliberations by the jury.

Based on the evidence presented, we cannot say as a matter of law that punitive damages equal to 32 times the award of compensatory damages were unreasonable. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d 381, 390.)

Ohio also contends the punitive damage award was excessive because it represented 1.9 percent of its net worth and 1 percent of the net worth of its parent company.

■ Wealth is an important consideration in determining the excessiveness of a punitive damage award. Because the purposes of punitive damages are to punish the wrongdoer and to make an example of him, the wealthier

the wrongdoer, the larger the award of punitive damages. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) A defendant's net worth is generally considered the best measure of his wealth for the purpose of assessing exemplary damages. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d 381, 391.)

 The evidence established that Ohio Casualty Corporation, the parent company, owned 100 percent of the stock of defendant Ohio Casualty Insurance Company and other companies; that these companies occupied the same office space, used the same claims manual and claims handling procedures, and employed many of the same personnel; and that one consolidated set of financial statements was prepared for these companies. For all intents and purposes, therefore, these companies were one and the same.

In *Moore* v. *American United Life Ins. Co., supra,* 150 Cal.App.3d 610, 641, the court upheld a punitive damage award which represented 3.2 percent of the defendant's net assets. Here we cannot say that the proportion of punitive damages to net worth is, as a matter of law, excessive. (*Moore* v. *American United Life Ins. Co., supra,* at p. 642.)

Relying on its net income rather than that of its parent company, Ohio argues that the punitive damage award represents 16.7 percent of its net annual income and is therefore excessive. As we noted earlier, the evidence established that for all intents and purposes the two companies were one. The average net annual income for the period 1978 to 1982 was some $70 million. The jury's award of punitive damages of $5 million represents 3.64 weeks of Ohio's net annual income. In *Moore* v. *American United Life Ins. Co., supra,* 150 Cal.App.3d 610, 642, the court upheld a punitive damage award which represented 3.4 weeks of the defendant's net annual income.

We cannot conclude that, as a matter of law, the punitive damage award in this case is excessive. Also, the jury's award of punitive damages was scrutinized by an experienced trial judge on a motion for a new trial, which was denied. Although a trial court's determination is not binding upon a reviewing court, it is to be given great weight because of the trial court's greater familiarity with the evidence. (*Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, 64.) Reviewing the record in light of this rule, we cannot conclude the trial court was wrong.

3. *Alleged Violations of Eighth and Fourteenth Amendments*

 Ohio claims the punitive damage award violates the Eighth Amendment's prohibition against the imposition of excessive fines. We have already

concluded the award is not excessive as a matter of law. Moreover, the Eighth Amendment applies only to criminal actions, not to purely civil penalties, as involved here. (*Ingraham* v. *Wright* (1977) 430 U.S. 651, 664 [51 L.Ed.2d 711, 725-726, 97 S.Ct. 1401]; *Zwick* v. *Freeman* (2d Cir. 1967) 373 F.2d 110, 119.)

▮ Ohio also contends the punitive damage award was imposed in a civil action " 'unaccompanied by the types of safeguards present in criminal proceedings,' " in violation of the Fourteenth Amendment due process clause. Where, as here, the action is civil in nature, civil rules rather than criminal rules of procedure apply. (*Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 717 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) Besides, Ohio has failed to identify the "safeguards" it was allegedly denied. We conclude the award of penal damages made under civil rules of procedure did not violate any of Ohio's constitutional rights. (*Toole* v. *Richardson-Merrell Inc., supra,* at p. 717.)

### DISPOSITION

The judgment is affirmed as to Ohio's appeal but reversed as to Downey's appeal.

With respect to Downey's appeal, the judgment is reversed based on the trial court's refusal to allow Downey to recover, as part of its damages, costs and attorney's fees incurred in its lawsuit against Ohio to obtain the benefits of the fidelity bond. (*Brandt* v. *Superior Court, supra,* 37 Cal.3d 813, 819-820.) On remand, the trial court shall conduct a hearing to determine such fees. Downey is also entitled to attorney's fees on appeal. Although an appellate court may determine such fees, we believe the trial court on remand will be in a better position to do so. (*Hadley* v. *Krepel* (1985) 167 Cal.App.3d 677, 687 [214 Cal.Rptr. 461]; *Leaf* v. *Phil Rauch, Inc.* (1975) 47 Cal.App.3d 371, 379 [120 Cal.Rptr. 749].)

Downey shall recover its costs on appeal.

Klein, P. J., and Lui, J., concurred.

A petition for a rehearing was denied March 17, 1987, and the petition of defendant and appellant for review by the Supreme Court was denied May 27, 1987.