FEDERAL DEPOSIT INSURANCE COR-
PORATION, in its capacity as Manager
of the FSLIC Resolution Fund, statuto-
ry successor to FSLIC in its corporate
capacity, Plaintiff–Appellee,

v.

J. William OLDENBURG, Investment
Mortgage International, Inc., Empire
State West, Landfund, Ltd., James W.
Rossetti, Martin L. Mandel, Charles H.
Burgardt, Defendants,

and

MGIC Indemnity Corporation, American
Casualty Insurance Company of
Reading, Defendants–Appellants.

Nos. 91–4093, 91–4095 and 91–4137.

United States Court of Appeals,
Tenth Circuit.

Sept. 8, 1994.

Rehearing Denied Dec. 2, 1994.

Louis C. Roberts (Leonard S. Surdyk, with him on the briefs), Peterson & Ross, Chicago, IL, for MGIC Indem. Corp. and American Cas. Co. of Reading, Pennsylvania, defendants-appellants.

David W. Alexander (John R. Gall and Philomena M. Dane, Squire, Sanders & Dempsey, Columbus, OH, and Herschel J. Saperstein, Watkiss & Saperstein, Salt Lake City, UT, with him on the briefs), Squire, Sanders & Dempsey, Columbus, OH, for F.D.I.C., plaintiff-appellee.

Before SEYMOUR, Chief Judge,
RONEY,* and LOGAN, Circuit Judges.

SEYMOUR, Chief Judge.

The Federal Deposit Insurance Corporation (FDIC), acting in its corporate capacity,[1] sued certain former officers and directors of the State Savings & Loan Association of Salt Lake City, Utah (State Savings) for fraud and negligence. It also sued to recover under two separate savings and loan blanket bonds issued to State Savings. This appeal involves only the two blanket bonds. The district court issued a series of pretrial rulings and then held a bench trial, after which it made extensive findings of fact and entered judgment for the FDIC on both fidelity bonds. The fidelity insurers appeal several of the court's rulings, and the FDIC cross appeals the court's denial of prejudgment interest. We affirm in part, reverse in part, and remand for further proceedings.

## I.

## BACKGROUND

### A. Factual Summary

The claims surrounding this appeal involve a piece of real estate located in Richmond, California, known as Park Glen Estates (Park Glen). Defendant J. William Oldenburg was the owner, president, and chairman of the board of both Investment Mortgage International, Inc. (IMI) and Empire State West (Empire). IMI provided real estate

---

* The Honorable Paul H. Roney, Senior Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. Prior to August 9, 1991 the Federal Savings and Loan Insurance Corporation (FSLIC) was a corporate body and agency of the United States under control of the Federal Home Loan Bank Board (FHLBB). The FSLIC was responsible for insuring the depository accounts of eligible institutions, including State Savings and Loan Association of Salt Lake City, Utah (State Savings). On April 12, 1985 the FHLBB appointed the FSLIC receiver of State Savings pursuant to 12 U.S.C. § 1729(c)(1)(B) because, among other things, State Savings was insolvent. The FSLIC, as receiver, subsequently assigned to FSLIC, in its corporate capacity, all claims of State Savings against the former directors, officers, controlling persons, employees and shareholders. Pursuant to 12 U.S.C. § 1821a [§ 11a of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA)] all assets of the FSLIC were transferred to the FSLIC Resolution Fund and all assets of the FSLIC Resolution Fund are managed by the FDIC. The FDIC, in its capacity as manager of the FSLIC Resolution Fund, has been substituted as plaintiff herein. For purposes of simplicity the FDIC will be referred to as plaintiff throughout this opinion.

financing services, and Empire was primarily engaged in the business of owning and developing Park Glen. Although IMI was in good financial condition until July 1983, it began to rapidly deteriorate soon thereafter as its expenses far exceeded its earnings. According to the district court's findings, IMI's financial problems were due in part to an expensive relocation of corporate offices and other extravagant expenditures by Oldenburg and IMI. Aplt. App., vol. I at 183. By the end of January 1984, IMI was in serious financial trouble.

In October 1983, Oldenburg became the owner of State Savings after he purchased 99.9% of State Savings stock for $10.5 million in cash. On January 30, 1984, senior employees of IMI called James Rossetti, the President of State Savings,[2] and told him that Oldenburg or IMI wanted to borrow $10 million from State Savings. State Savings' General Counsel, Charles Burgardt, was with Rossetti when he received this call, and they both agreed to advise Oldenburg that it would be improper and a violation of federal banking regulations to make such a loan.[3] Nevertheless, Rossetti, Burgardt, and several other individuals met to discuss ways in which Oldenburg's request for $10 million could be satisfied. They agreed that the only way to get $10 million to Oldenburg or IMI would be for federal regulators to approve the sale by Oldenburg of something worth $10 million to State Savings.

The next day, Rossetti, Oldenburg, Thomas Kambe, who was the president of Empire, and others had a meeting at the corporate offices of IMI where Kambe was advised that Park Glen was going to be sold by Empire to State Savings for $50 million. No one at this meeting brought up or discussed an appraisal of the Park Glen property, or discussed the fact that Park Glen was currently subject to $16.5 million in encumbrances. As of March 1984, the fair market value of Park Glen as raw land was about $4.1 million.[4]

Prior to approval of the Park Glen transaction by State Savings' board of directors and only one day after Oldenburg requested the $10 million loan, Rossetti had $10 million transferred from State Savings to IMI even though he was well aware of the need for federal approval of the transaction. Because IMI was on the verge of financial collapse, this cash infusion was essential for IMI to continue its operations. IMI used the money as capital or to pay its bills.

In late February, a supervisory agent of the Federal Home Loan Bank of Seattle (FHLB), John Morris, became concerned about affiliated transactions between State Savings and other Oldenburg companies. He advised Rossetti, Burgardt, and senior management of IMI that no dealings were to take place between State Savings and any Oldenburg companies until the FHLB had more information. Despite this verbal order, Rossetti, Burgardt, and others proceeded with the Park Glen purchase without seeking federal approval.

State Savings held its Board of Directors[5] regular meeting on March 23, 1984. Bryan Wilkinson, the only outside director of State Savings, had been given no prior notice of the Park Glen purchase. He was asked to ratify the purchase of Park Glen after being told that the board had decided to purchase the property at a "special board meeting" on January 31. The district court found that Oldenburg, Rossetti, Burgardt, and Martin Mandel, who was a director of State Savings and also corporate counsel for IMI, either failed to disclose or deliberately misrepresented pertinent facts necessary for Wilkinson to make an informed decision on Park Glen. These facts included that 1) Park Glen was owned by Empire, which was in turn owned

---

**2.** Rossetti was also a former employee of IMI.

**3.** *See generally,* 12 C.F.R. §§ 561.25, 563.41–.43 (1987).

**4.** Empire had purchased Park Glen several years before for approximately $3.5 million, which included the costs, fees, and improvements to the raw land.

**5.** The Board of Directors was composed of Rossetti, Oldenburg, Martin Mandel (Senior Vice President and Corporate Counsel for IMI), Nicholas Muccino (Senior Vice President and Director of IMI), and Bryan Wilkinson, the only outside director.

by Oldenburg, and that Empire had purchased Park Glen for $3.5 million, 2) IMI was very short of cash, 3) Oldenburg and IMI had tried to borrow $10 million directly from State Savings, 4) Rossetti had refused the loan request because he believed it was unlawful, 5) the Park Glen deal was conceived as a vehicle to circumvent prohibitions on a direct loan to Oldenburg, 6) State Savings had already transferred $10 Million to IMI, 7) the FHLB had already specifically prohibited State Savings from engaging in any transactions with Oldenburg companies, 8) the January 31 meeting represented in the back-dated minutes was not a legitimate board meeting, and 9) federal disclosure of the transaction had not been made. Aplt. App., vol. I, at 192–93. Wilkinson voted to proceed with the transaction.

Burgardt closed the Park Glen sale on March 30 for a purchase price of $55.7 million.[6] Kambe executed the agreement as president of Empire but did not know why the price had increased $5.7 million from the $50 million price agreed on at the January 31 meeting. The final purchase agreement did not include any provision requiring approval of the transaction by federal or Utah regulators, or a provision providing for a refund if the deal was not approved by regulators. State Savings transferred $11.5 million to the escrow agent for the transaction, plus an additional $5 million which it borrowed from another savings and loan.[7] The escrow agent paid a total of approximately $15.6 million to Bank of the West and Gibraltar Savings and Loan Association for loans on which Oldenburg had previously given personal guarantees. Another payment of $562,664.95 was given directly to IMI at closing without explanation.

Oldenburg, Rossetti, Burgardt, Mandel, and others continued to deliberately deceive federal regulators by concealing the Park Glen transaction. Federal regulators' initial requests for information about a possible af-

filiated transaction went unsatisfied. When they finally learned of the Park Glen transfer, Rossetti, Burgardt, Mandel, and Oldenburg gave them information they knew was false. As the full scope of the Park Glen transaction came to light, the FDIC and Utah state regulators issued cease and desist orders to State Savings in June 1984. State Savings eventually became insolvent and the FSLIC became its receiver in April 1985. FSLIC sold the Park Glen property for $4.5 million in 1988.

During the period from February 6, 1981 through February 5, 1984, State Savings was insured under the terms of a savings and loan blanket bond issued by defendant MGIC Indemnity Corporation (MGIC). From February 6, 1984 to October 15, 1984, State Savings was insured under a blanket bond issued by defendant American Casualty (American). American acquired portions of the MGIC insurance business in the latter part of 1983, including its fidelity bond obligations. Any liability accruing under either bond is thus the obligation of American. Consequently, only American was named in the judgment below, and American and MGIC will be referred to collectively in this opinion as "American."

### B. Proceedings Below

This appeal arises from the FDIC's action against American to recover under the provisions of the two blanket bonds for the losses State Savings suffered as a result of the Park Glen transaction. The district court entered judgment in favor of the FDIC and against American in the amount of $3 million under each bond, for a total of $6 million. The court denied prejudgment interest on all claims. On appeal, American contends the district court erred by concluding that (1) both Rossetti and Burgardt acted with manifest intent to cause State Savings to sustain a loss, (2) discovery of loss occurred under both bonds, (3) late notice of loss under the

---

6. Even though the final purchase price of Park Glen was $55.7 million, the record shows that only $16.5 million was transferred from State Savings on the closing date. The remaining amount was to be made up by a transfer of real estate from State Savings to Empire. *See* Aplt. App., vol. II, at 690.

7. Mandel and Burgardt both knew at the time that the Board of Directors of State Savings had not approved borrowing $5 million to purchase Park Glen.

bonds did not defeat coverage or prejudice American, (4) the automatic termination provisions did not apply to terminate coverage under the bonds, (5) the doctrine articulated in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e) (Supp.1990) [8] applied to bar American's affirmative defenses, (6) testimony concerning the regulatory review of Oldenburg's finances was not admissible, and (7) the FDIC could properly use certain expert testimony. The FDIC cross-appeals the court's denial of prejudgment interest.

## II.

### COVERAGE UNDER THE BONDS

As we have noted, from February 6, 1981 through February 5, 1984, State Savings was insured under the terms of a savings and loan blanket bond issued by MGIC (MGIC bond). American issued a similar blanket bond which insured State Savings from February 6, 1984 through October 15, 1984 (American bond). A brief overview of the bond provisions relevant to this appeal provides a context for the claims raised by American.

Both bonds cover losses resulting from dishonest and fraudulent acts of bank employees done with the "manifest intent" to cause the bank to sustain a loss. The bonds provide that

> Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent
>
> (a) to cause the Insured to sustain such loss, and (b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit....

Aplt. App., vol. III, at 1166, 1180. A showing of manifest intent is thus a prerequisite to recovery under either bond.

The bonds only apply to losses "discovered" while the bond is in effect. The American bond states for example,

> Section 4. This bond applies to loss discovered by the Insured during the bond period. Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.
>
> Notice to the Insured of an actual or potential claim by a third party which alleges that the insured is liable under circumstances which, if true, would create a loss under this bond constitutes such discovery.

*Id.* at 1184.[9] Therefore, in order for FDIC to recover on either bond, it had to establish that loss was discovered during the relevant bond period. Both the MGIC bond and the American bond also require that notice of discovered losses be given to the insurer "at the earliest practicable moment" after discovery of any loss, in the case of the American bond no later than thirty days after discovery of loss. *Id.* at 1152, 1184.

Finally, both bonds contain an automatic termination provision. This provision effectively prohibits an insured from benefitting from bond coverage if it knowingly continues to employ a dishonest individual. The bonds provide that coverage is automatically cancelled as to any employee "as soon as any Insured, or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by such person...." *Id.* at 1186 (quoted language from American bond); *see also id.* at 1153.

Based on the fraudulent and dishonest acts of Rossetti and Burgardt with respect to the Park Glen transaction, the FDIC claims the right to recover under both bonds. The district court found in favor of the FDIC on all relevant issues of bond coverage. More specifically, the court ruled that (1) both

---

**8.** This version of the statute, passed in 1989, is substantially the same as the former provision, 12 U.S.C. § 1823 (1982), the only changes being in form and verb tense.

**9.** The MGIC bond covers "loss sustained by the Insured at any time but discovered during the Bond period." *Id.* at 1149. Neither party argues that the difference between the two bonds' discovery provisions is material to this appeal.

Rossetti and Burgardt acted with the requisite manifest intent; (2) loss caused by Rossetti was discovered under both bonds and loss caused by Burgardt was discovered during the American bond period; (3) any late notice of discovered loss did not prejudice American and therefore could not defeat coverage under the bonds; and (4) the automatic termination provisions did not apply because no person not in collusion with Rossetti learned of his dishonest acts. We review the court's factual findings under the clearly erroneous standard, *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 901 (10th Cir.1992), and its conclusions of law *de novo*, *Estate of Holl v. Commissioner*, 967 F.2d 1437, 1438 (10th Cir.1992).

American appeals all of the district court's rulings with respect to bond coverage. It contends there is no coverage under either bond because neither Rossetti nor Burgardt acted with manifest intent. Even assuming Rossetti and Burgardt acted dishonestly, American claims there was no discovery of loss within the bond period. American also asserts that late notice of loss precludes recovery under the bonds, that a showing of prejudice from late notice is not required to avoid coverage on this basis, and, in any event, it was prejudiced by the late notice. Finally, American contends that the automatic termination provisions effectively cancelled coverage as to Rossetti and Burgardt because State Savings learned of certain dishonest acts of Rossetti and Burgardt prior to their involvement with the Park Glen transaction.

For the reasons stated below, we reverse the judgment under the MGIC bond because we hold the district court erred by concluding as a matter of law that Rossetti acted with manifest intent and that such loss was discovered under the MGIC bond. We affirm the court's ruling that Burgardt acted with manifest intent under the American bond, that loss caused by Burgardt's acts was discovered during the American bond period, and that the automatic termination provisions of the bonds did not apply. We reverse

the judgment under the American bond, however, and remand for the district court to reconsider the prejudice issue.

■ As a preliminary matter, we note that suits brought by the FDIC are governed by federal law. 12 U.S.C. § 1819; *FDIC v. United Pac. Ins. Co.*, 20 F.3d 1070, 1076 (10th Cir.1994); *FDIC v. Kansas Bankers Sur. Co.*, 963 F.2d 289, 293 (10th Cir.1992). In the absence of a controlling federal statute, it is a matter of judicial policy as to whether a court should apply state substantive law or fashion a federal common law rule.[10] *See Kansas Bankers*, 963 F.2d at 294. State law is presumed adequate unless it conflicts with federal statutory provisions or "there is a 'significant conflict between some federal policy or interest and the use of state law.'" *O'Melveny & Myers v. FDIC*, —— U.S. ——, ————, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994) (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)); *see also FDIC v. Palermo*, 815 F.2d 1329, 1334–35 (10th Cir.1987); *FDIC v. Braemoor Assocs.*, 686 F.2d 550, 554 (7th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983).

■ Although the FDIC is a party to this suit, the essence of this case involves recovery under fidelity bonds issued under Utah state law. With the exception of American's affirmative defense of misrepresentation, which invokes special federal rules of decision, *see* 12 U.S.C. § 1823(e), adopting state law as the rule of decision in this case raises no significant conflicts with federal policy or interests. *See United States v. Kimbell Foods*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979); *see also O'Melveny & Myers*, —— U.S. at ————, 114 S.Ct. at 2053–2055 (in suit by FDIC, as receiver, against attorneys of failed savings and loan association, California law presumed to govern issue of imputation of corporate officers' knowledge where such issue left unaddressed by federal statutory scheme).

---

10. Neither party to this action has specifically addressed whether the substantive law to be applied in this case is state law or federal common law. However, both parties and the district court relied on Utah law, where available, and it appears the parties proceeded under the assumption that state substantive law governed this action.

█ Utah courts, however, have either not addressed at all or not definitely settled many of the issues raised in this litigation. "As matters stand, however, federal judges must do their best to estimate how the relevant state courts would perform their lawmaking task, and then emulate that sometimes purely hypothetical model." *O'Melveny & Myers,* —— U.S. at ——, 114 S.Ct. at 2056 (Stevens, J., concurring). In deciding an issue that the Utah Supreme Court has not addressed, we must look to lower "state court decisions, decisions of other states, federal decisions," and other available resources in deciding how the Utah Supreme Court would decide the issue. *See Armijo v. Ex Cam, Inc.,* 843 F.2d 406, 407 (10th Cir.1988) (diversity case).

### A. Manifest Intent

█ The first issue regarding application of the bonds is the meaning of the term "manifest intent" and whether the conduct of Rossetti and Burgardt in relation to the Park Glen transaction meets the manifest intent standard.[11] Because Utah courts have not addressed this issue, we turn to other jurisdictions. Manifest intent is intent that is "apparent or obvious." *First Fed. Sav. & Loan v. Transamerica Ins.,* 935 F.2d 1164, 1166 n. 3 (10th Cir.1991) (Utah diversity case relying on law from numerous jurisdictions). We recently visited the issue of manifest intent in *FDIC v. United Pac. Ins. Co.,* 20 F.3d 1070 (10th Cir.1994), where we approved various jury instructions on manifest intent. We stated:

> Manifest intent does not require that the employee actively wish for or desire a particular result; rather, *manifest intent exists when a particular result is substantially certain to follow from the employee's conduct. Manifest intent to cause a loss may be inferred from an employee's reckless conduct and other circumstantial evidence.* Direct evidence of the employee's intent is not required, and a claim by an employee that he intended no loss to the bank is not conclusive.

11. American does not dispute that Rossetti and Burgardt acted for the financial benefit of "any

*Id.* at 1078 (citations omitted) (emphasis added). The meaning of manifest intent outlined in *United Pacific* is in full accord with other jurisdictions that have considered this issue. *See, e.g., FDIC v. St. Paul Fire & Marine Ins. Co.,* 942 F.2d 1032, 1035 (6th Cir.1991) ("For us, the external behavior ordinarily thought to manifest internal mental states is all that matters." (citing cases from other jurisdictions)). With this standard in mind, we examine the district court's rulings on manifest intent.

### 1. Rossetti's Manifest Intent

█ In criminal proceedings regarding Park Glen, which took place in federal district court in California, Rossetti pled guilty to willfully misapplying State Savings' funds with the intent to injure and defraud State Savings in violation of 18 U.S.C. § 657, conspiring to misapply State Savings' funds in violation of 18 U.S.C. § 371, and wire fraud in violation of 18 U.S.C. § 1343. Based on Rossetti's guilty plea, the district court in the present action granted summary judgment to the FDIC on the issue of Rossetti's manifest intent to cause State Savings to sustain a loss. The court held that "given defendant Rossetti's guilty plea[,] the language in the insuring agreements covers the loss sustained by plaintiffs as a matter of law." Aplt. App., vol. III, at 843. American contends this ruling is erroneous. We agree and hold that Rossetti's guilty plea does not establish liability under the bond as a matter of law.

Summary judgment is appropriate only where there are no genuine issues of material fact and one party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We view any factual conflicts in the light most favorable to the party resisting the motion. Rossetti's guilty plea to multiple criminal charges related to the Park Glen transaction is certainly evidence of his intent to cause State Savings a loss. *See First Nat'l Bank of Louisville v. Lustig,* 961 F.2d 1162, 1165 (5th Cir.1992) ("A guilty plea to a criminal charge is evidence, perhaps powerful, but it is far from the only evidence of [ ] intent presented in this case."). Under the circum-

other person or organization" as required under the bond's definition of manifest intent.

stances of this case, however, Rossetti's guilty plea is insufficient by itself to justify the district court's grant of summary judgment.

■ While Rossetti admitted wrongdoing and poor judgment at his plea hearing, he never admitted to intending to cause a loss to State Savings. On the contrary, in sworn testimony Rossetti maintained that he believed the Park Glen transaction would benefit State Savings. Aplt. App., vol. II, at 795. This is clearly not like embezzlement where "the nature of the dishonest act itself demonstrates the employee's intent." *Lustig*, 961 F.2d at 1165. While Rossetti's subjective proclamations that he intended to benefit State Savings are not conclusive, *see id.* at 1166, where an individual's conduct falls somewhere between the two extremes of embezzlement and simple poor judgment, "intent becomes a question of fact which will generally not be subject to summary judgment." *Id.*

■ Moreover, contrary to the FDIC's assertions, Rossetti's guilty plea to willfully misapplying funds in violation of 18 U.S.C. § 657 does not conclusively establish that he intended to cause State Savings to suffer a loss. Rossetti pled guilty in California under the jurisdiction of the Ninth Circuit. Applicable law in the Ninth Circuit holds that intent to *deceive* regulators establishes the intent element of misapplication and "[t]here need be no intent to *injure.*" *See United States v. Wolf*, 820 F.2d 1499, 1503 (9th Cir.1987) (emphasis added), *cert.*

*denied*, 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988); *see also United States v. Brown*, 912 F.2d 1040, 1044 (9th Cir.1990). Rossetti's guilty plea to misapplying funds is thus inconclusive as to his intent to cause a loss to State Savings.[12] We hold that there is a genuine issue of material fact as to Rossetti's intent. The district court therefore erred by granting summary judgment based on Rossetti's guilty plea.[13]

*2. Burgardt's manifest intent*

■ After hearing the evidence at trial, the district court ruled that Burgardt, who was corporate counsel for State Savings, "acted fraudulently and dishonestly with the requisite intent required by the bond and that State Savings was thereby caused to sustain loss on March 30, 1984 in the amount of $16,500,000.00 on that date." Aplt. App., vol. I, at 210.[14] American contends that this finding is clearly erroneous. We disagree.

A trial court's findings of fact will only be reversed if we are " 'left with the definite and firm conviction that a mistake has been made.' " *Las Vegas Ice & Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir.1990) (quoting *LeMaire v. United States*, 826 F.2d 949, 953 (10th Cir.1987)). In making its determination, the district court had at its disposal testimony from the bench trial it conducted in April 1990, as well as thousands of pages of deposition testimony and documentary evidence involving the Park Glen transaction. The comparative credibility of the parties involved in the Park Glen

---

12. The FDIC also asserts that Rossetti's plea to count two of the indictment, charging that "with the *intent to injure and defraud State Savings*, [Rossetti] did willfully misapply and cause to be misapplied monies, funds, and credits belonging to and entrusted to the care of State Savings," Aplee. Br. at 13 n. 11, establishes prima facie evidence of liability under the terms of the bond, and that American did not present sufficient evidence to defeat summary judgment. *Id.* at 20. Because intent to injure is not a necessary element of a misapplication offense in the Ninth Circuit, we think the guilty plea colloquy is sufficient to overcome the FDIC's prima facie case. *See* Aplt.App., vol. II, at 795.

13. On June 6, 1991, Rossetti filed in criminal court a motion to withdraw his prior guilty plea. The motion was denied. Relying on Rossetti's

attempt to withdraw his guilty plea, American sought relief from the district court's judgment below by filing a motion pursuant to Fed.R.Civ.P. 60(b). The court denied American's Rule 60(b) motion and American appeals the court's ruling. In light of our reversal of the district court's grant of summary judgment as to Rossetti's guilty plea, we need not address American's Rule 60(b) claim.

14. Even though the court's holding that Burgardt acted with manifest intent appears under a section of the court's ruling entitled "Conclusions of Law," we "apply the clearly erroneous standard [because] the question is primarily a factual inquiry." *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572 (10th Cir.) *cert. denied*, —— U.S. ——, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991). American does not argue otherwise.

deal was critical to the court's decision because of conflicting versions of the same events. We are particularly deferential to the court's findings based on assessments of credibility. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

The record amply supports the district court's findings on this issue. There is evidence that Burgardt was well aware of the federal regulations governing State Savings' "purchase" of Park Glen. He also knew that the supervisory agent at the Federal Home Loan Bank of Seattle had restricted all dealings between State Savings and any Oldenburg company. There is evidence that Burgardt suggested back-dating the minutes of the January 31, 1984 "special board meeting" with the express purpose of making it appear that the Park Glen transaction had prior approval from State Savings' Board of Directors. Aplt. App., vol. IV, at 1515–16, 1613.[15] These back-dated minutes were used at the critical State Savings board meeting of March 23, 1994, where Wilkinson, the only outside director, was asked to ratify what was represented as an earlier decision of the board. Burgardt participated with others at that meeting in either failing to disclose or materially misrepresenting information relevant to Wilkinson's decision to ratify the deal. Although there were different versions of what was actually discussed at the March 23 meeting, the district court chose to credit the testimony of Wilkinson. The court stated that, "[c]ontrary to what ... Burgardt [has] claimed, there was no discussion at the State Savings Board of Directors Meeting on March 23, 1984 concerning the requirement of Federal Home Loan Bank approval. Further, Wilkinson was not advised at that meeting that the $10,000,000.00 wire transfer had already been made." Aplt. App., vol. I, at 194. This finding is not clearly erroneous. *See* Aplt. App., vol. VIII, at 3339, 3342, 3349 (testimony of Wilkinson).

Despite full knowledge that federal approval was required but had not been ob-

tained, Burgardt personally closed the Park Glen transaction, after which State Savings transferred $16.5 million to the benefit of Oldenburg and his companies. The final purchase agreement did not include either a clause requiring federal approval or a refund clause in the event that federal approval was not received. Even after the closing, Burgardt continued to deceive federal regulators.

█ Because even "evidence of reckless conduct can support an inference of manifest intent," *United Pacific*, 20 F.3d at 1078, we think the evidence is sufficient to support the district court's finding that Burgardt acted with the manifest intent to cause State Savings to suffer a loss. *See id.* at 1076 n. 6 (factors supporting finding of manifest intent include entering questionable loan transactions without informing federal regulators and willfully blinding oneself to wrongdoing). Indeed, Burgardt's own testimony reveals that he took the actions described herein despite full knowledge of the possible negative consequences to State Savings. In a criminal case arising out of the Park Glen deal,[16] Burgardt testified: "I said we are going to run into problems, and the end result would be the toppling of State Savings and the toppling of IMI." Aplt. App., vol. IV, at 1620.

American attempts to avoid the consequences of the district court's findings by asserting that even if Burgardt did have the requisite manifest intent to cause a loss, he "was not a direct cause of loss in connection with the March 30, 1984 transfer of funds." Aplt. Br. at 27. American's argument is a poorly disguised attempt to reargue Burgardt's lack of manifest intent. The facts clearly show that Burgardt played an integral role in a wide range of events leading up to the March 30 transfer of $16.5 million, and that he closed the actual purchase of Park Glen on the day the transfer of funds was made. American fails to direct us to bond language or any caselaw that might convince us to accept its strained interpretation of the

---

15. The district court found that the January 31 meeting was not a legitimate meeting of State Savings' Board of Directors.

16. The Final Pretrial Order allowed the admission of certain testimony from prior criminal proceedings related to the Park Glen transaction. *See* Aplt. App., vol. I, at 139.

bond's causal requirements. *See Lustig,* 961 F.2d at 1167–68, 1169.

### B. Discovery of Loss

American next contends the district court erred by ruling that loss caused by Rossetti was discovered during both the MGIC bond period and the American bond period and that loss caused by Burgardt was discovered during the American bond period. Because we can easily affirm the court's ruling that discovery occurred during the American bond period, we deal with that bond first.

#### 1. American Bond

■ The American bond period ran from February 6, 1984 through October 15, 1984. To recover under this bond, the FDIC must establish that covered losses were discovered prior to October 15. "Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known." Aplt. App., vol. III, at 1184 (American bond language). "This language clearly ties coverage to discovery of *possible loss*" and does not require actual loss. *See Home Sav. & Loan v. Aetna Cas. & Sur.,* 817 P.2d 341, 356 (Utah App.1991) (emphasis added). Discovery requires that the insured have more than "mere suspicion" of loss, 13 *G. Couch, Insurance* § 46:198, at 152 (rev. 2d ed. 1982) (Couch), and the test is that of the objectively reasonable person. *See Federal Sav. & Loan Ins. v. Aetna Cas. & Sur.,* 785 F.Supp. 867, 868 (D.Mont.1990); *see also California Union Ins. v. American Diversified Sav.,* 948 F.2d 556, 563 (9th Cir.1991) (noting that " 'discovery' threshold is low").

The district court ruled after a bench trial that loss sustained as a result of Burgardt's conduct in relation to the March 30 transfer of $16.5 million from State Savings "was discovered at the latest at the time of the issuance of cease and desist orders by plaintiff [FDIC] and the Utah Department of Financial Institutions on June 1, 1984 and June 24, 1984." Aplt. App., vol. I, at 210. We find no basis to reverse the court's ruling as it is supported by ample evidence in the record, and American has failed to present a single reason why it should be overturned. Indeed, American appears to have conceded below, and the record confirms, that certain honest employees of State Savings, such as outside director Wilkinson and senior vice president Eugene Miller, were well aware of the facts surrounding the Park Glen transaction long before the American bond terminated on October 15. *See* Aplt. App., vol. I, at 271, 279; Aplt. App., vol. III, at 1049–86; Aplt. Supp. App. at 67–68; Aplee. Supp. App. at 74.

■ The district court also ruled, prior to trial, that discovery of loss sustained as a result of Rossetti's dishonest conduct was discovered during the American bond period. Aplt. App., vol. III, at 881. We treat the court's pretrial ruling on this issue as a grant of summary judgment which we review *de novo.* A grant of summary judgment is appropriate if there is no genuine dispute of material fact and the FDIC is entitled to judgment on this issue as a matter of law. *See Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991). Viewing the record in the light most favorable to American, we conclude the district court correctly ruled that loss caused by Rossetti was discovered during the American bond period. There was no genuine dispute over the issue of discovery of Rossetti's loss under the American bond in part because American conceded below that the issuance of formal cease and desist orders to State Savings by regulators in June 1984 "clearly indicates 'discovery' by those dates." Aplt. App., vol. I, at 271; *see also id.* at 279–80. Instead of contesting the issue of discovery under the American bond below, American chose to focus on late notice of loss in an attempt to avoid coverage. It cannot now avoid on appeal concessions it made before the district court. *See id.* at 279 (American noting that under direction of federal and Utah regulators, new directors and president were appointed to State Savings in September, several weeks prior to the termination of the American bond period).

We find the circumstances of this case similar to the facts in *Federal Sav. & Loan Ins.,* 785 F.Supp. 867, where the district court granted summary judgment to the in-

surer on the issue of discovery of loss under a fidelity bond with the same discovery provision that is at issue in this case. The evidence there of the FHLBB and FSLIC's extensive examinations and regulatory involvement with the bank unequivocally showed that the bank became "aware of facts which would cause a reasonable person to assume that a loss covered by the bond had been incurred." *Id.* at 870.

Based on the undisputed facts known to State Savings as a result of regulatory involvement and the issuance of formal cease and desist orders in June 1984, we hold the district court did not err by ruling prior to trial that loss sustained as a result of Rossetti's dishonest conduct was discovered during the American bond period. There is ample evidence in the record that honest employees or directors of State Savings became "aware of facts which would cause a reasonable person to assume that a loss covered by the bond" had been incurred, Aplt. App., vol. III, at 1184, and that they became aware prior to the termination of the American bond on October 15. We therefore affirm the district court's ruling that the discovery requirement of the American bond was satisfied.

## 2. MGIC Bond

■ The remaining discovery issue is whether loss sustained as a result of Rossetti's dishonest conduct in relation to the January wire transfer was discovered before February 6, 1984 when the MGIC bond period terminated. In a ruling prior to trial, the district court held that loss caused by Rossetti was discovered during the MGIC bond period. American claims this ruling constitutes reversible error. Before we address American's claim of error, an explanation of the procedural background leading up to the district court's ruling on discovery of loss is necessary.

American moved for summary judgment against the FDIC claiming the discovery and notice requirements of the bonds were not satisfied. In its brief before the district court, American stated "that State Savings may have been so dominated for a time, by its officers and directors as to make it impossible for it to comply with the notice and

proof of loss provisions" of the bonds. Aplt. App., vol. I, at 278. American argued, however, that the FDIC and the Utah regulators effectively discovered the loss under the American bond and that even if State Savings were dominated by wrongdoers, the regulators should have provided notice of discovered losses to American. In opposition, the FDIC asserted that there existed disputed issues of fact on this issue, that State Savings was adversely dominated and controlled by wrongdoers thus making notice impossible, and that American was not prejudiced by any late notice.

The district court denied American's motion for summary judgment. It ruled that any late notice by the FDIC did not bar recovery as a matter of law because American failed to put on evidence that it was prejudiced by the late notice. Aplt. App., vol. I, at 288. The court explicitly declined to address the FDIC's argument of adverse domination and control, and did not mention when any loss was discovered under the MGIC bond.

Following the court's denial of summary judgment to American, pre-trial discovery proceeded and several years later the parties filed cross-motions for summary judgment. The district court granted the FDIC's partial motion for summary judgment with respect to the effect of Rossetti's guilty plea to criminal charges, concluding that "given Rossetti's plea the language in the insuring agreements covers the loss sustained by plaintiffs as a matter of law." Aplt. App., vol. III, at 843. Disturbed by the district court's ruling on the guilty plea, American asked the court to reconsider its decision and to clarify whether its summary judgment ruling on the guilty plea also meant that a loss, sustained as a result of Rossetti's dishonest acts, was "discovered" under the terms of the bonds. The court ruled against American in April 1990, stating that

By this court's decisions of August 28, 1987 [denial of American's motion for summary judgment] and February 28, 1990 [granting FDIC's motion for summary judgment as to Rossetti's guilty plea], the court has ruled that plaintiff has established as a matter of law not only that

Rossetti acted dishonestly within the meaning of the bonds, but also that a loss was sustained by reason of his acts and was discovered during the term of the American Casualty bond and that another loss was sustained by reason of his acts which was discovered during the term of the MGIC bond.

*Id.* at 881.

It is this Order that American now appeals. Because we have already disposed of the discovery issue under the American bond, we deal here only with the court's ruling as to the MGIC bond. American contends that the court's prior rulings in no way establish when discovery of loss occurred, much less that it occurred within the period of the MGIC bond. American's main argument is that knowledge of wrongdoers is not imputed to an institution; therefore, because the court found that no person not in collusion with Rossetti learned of his dishonest acts prior to March 30, there was no person to discover loss prior to February 6 when the MGIC bond period terminated. The FDIC contends, on the other hand, that American conceded discovery below. In the alternative, the FDIC argues that the factual findings of the court after trial now make clear that State Savings was adversely dominated and controlled by wrongdoers and, therefore, the law infers discovery during the bond period because actual discovery was impossible.

After reviewing the record, the briefs, and the court's prior rulings, we are unable to ascertain the basis of the court's conclusion that discovery of loss occurred during the MGIC bond period. For discovery to have occurred, State Savings must have been aware, prior to February 6, of facts that would cause a reasonable person to assume that a covered loss had been or would be incurred. The record reveals that regulatory involvement with State Savings had just begun in February, and it was not until late February that John Morris, a supervisory agent at the FHLB, told Rossetti, Burhardt and senior management of IMI to cease any affiliated transactions between State Savings and Oldenburg companies. Furthermore, unlike discovery of loss during the American bond period, American never conceded that discovery of loss had occurred during the MGIC bond period. On the contrary, American explicitly asserted "[i]t is entirely likely that discovery did not occur until after" February 6, 1984, the end of the MGIC bond period. Aplt. App., vol. I, at 271. Nowhere are there factual findings or evidence which would allow us to conclude that State Savings had discovered covered losses prior to February 6 when the MGIC bond terminated.

The FDIC asserts that State Savings was adversely dominated by wrongdoers, thus making discovery under the MGIC bond impossible. We do not reach this issue because we are unwilling to conclude on appeal that the facts as found by the court after trial affirmatively establish that State Savings was adversely dominated and controlled by wrongdoers. *See FDIC v. Appling*, 992 F.2d 1109, 1115–16 (10th Cir.1993) (discussing theory of adverse domination as it relates to tolling statutes of limitations); *California Union Ins. v. American Diversified Sav.*, 948 F.2d 556, 565 (9th Cir.1991) (no adverse domination on the facts); *J.I. Corp. v. Federal Ins. Co.*, 920 F.2d 118, 119 (1st Cir.1990) (no adverse domination on the facts); *Paradis v. Aetna Cas. & Sur. Co.*, 796 F.Supp. 59, 62–63 (D.R.I.1992) (adverse domination tolled fidelity bond discovery period); *In re Lloyd Securities, Inc.*, 153 B.R. 677, 685 (E.D.Pa.1993) (same). The FDIC presented its adverse domination argument to the district court throughout this litigation. Despite ample opportunity, the court never expressly decided this issue, and we will not do so on appeal. The district court may, on remand, decide the proper application of the theory of adverse domination to the facts of this case.[17]

---

17. The district court found below that American had failed to show that "a person not in collusion with Rossetti learned of Rossetti's dishonest conduct prior to March 30, 1984." Aplt. App., vol. I, at 206. This finding prevented activation of the automatic termination clause of the American bond, *id.* at 209, which provides for cancellation of coverage as to a particular employee when the insured learns of such employee's dishonesty. While this finding may support the FDIC's adverse domination argument, we do not think it is sufficient for us to make a finding of adverse

Because we are unable to ascertain the basis of the district court's ruling as to discovery of loss during the MGIC bond period, we reverse the district court's April 1990 Order with respect to discovery under the MGIC bond and remand this issue for further consideration.

### C. Late Notice and Prejudice

■ It is undisputed that American received official notice of loss on April 19, 1985, approximately one week after the FDIC became the receiver of State Savings. American sought to avoid coverage below on the basis of this late notice, arguing it was prejudiced because of it. The FDIC argues that American suffered no prejudice because it had actual notice of the Park Glen transaction. The district court held as a matter of common law that to avoid policy coverage on the basis of late notice, American had to prove that it suffered material prejudice from untimely notice. The court found as a matter of fact that "Defendants MGIC and American have not shown that they were prejudiced by late notice in their ability to investigate, settle or defend the claims at issue." Aplt. App., vol. I, at 205. American contends on appeal that (1) as a matter of Utah law, prejudice is not required to avoid coverage due to untimely notice, (2) even if prejudice is required, the court applied the wrong test, and (3) the evidence supports a finding of prejudice. We deal with each of these arguments in turn.

■ The district court held an "insurer must show that it was materially prejudiced by the insured's failure to file timely [notice] before an insurer can avoid coverage on that basis." Id. at 209; see also id. at 285. Whether prejudice is required is a question of law. FDIC v. Kansas Bankers Sur. Co., 963 F.2d 289, 294 (10th Cir.1992).

■ We start our analysis with the language of the bonds. "Contract interpretation begins with an examination of the contract itself to determine the intention of the parties. The document should be interpreted in a manner to harmonize all of its provisions and terms, to the extent possible."

Home Sav. & Loan v. Aetna Cas. & Sur., 817 P.2d 341, 347 (Utah App.1991). Where there exists legitimate ambiguity in the meaning of insurance contract terms, "ambiguous provisions are usually construed against the insurer." Id.

The American bond provides that "[a]t the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the underwriter notice thereof." Aplt. App., vol. III, at 1184. The MGIC bond simply provides that the insured shall give notice of discovery of loss "[a]t the earliest practicable moment" thereafter. Id. at 1152. Neither bond states that timely notice is a condition precedent to recovery or that coverage under the bond will be forfeited or cancelled if notice is untimely. Compare Anderson v. Beneficial Fire & Cas. Co., 21 Utah 2d 173, 442 P.2d 933, 934 (1968) (where theft policy had explicit forfeiture clause, insured's failure to file suit within time specified by policy defeats coverage). In other words, the consequences of noncompliance with the notice provisions of the bonds are not defined. Because the bonds in question do not expressly condition coverage upon timely notice, we must determine whether late notice of loss automatically relieves American of liability absent any showing of prejudice.

■ Utah courts have not directly addressed whether a showing of prejudice is required to avoid fidelity coverage on the basis of noncompliance with notice provisions. See AOK Lands, Inc. v. Shand, Morahan & Co., 860 P.2d 924, 928 (Utah 1993) (upholding, in dicta, trial court's conclusion of prejudice but refusing to directly decide if prejudice showing required where insured failed to comply with notice requirements of claims-made policy); Busch Corp. v. State Farm Fire & Cas. Co., 743 P.2d 1217, 1221 n. 6 (Utah 1987) (same); Peterson v. Western Cas. & Sur. Co., 19 Utah 2d 26, 425 P.2d 769, 770 (1967) (insurer can not avoid coverage for lack of cooperation under automobile policy absent a showing of prejudice); cf. Anderson,

domination on appeal. We leave questions of

fact for the district court on remand.

442 P.2d at 934.[18] We therefore look to other jurisdictions to help us decide how the Utah Supreme Court would resolve this issue.

A review of the law of other jurisdictions reveals substantial support for the proposition that noncompliance with notice provisions of a fidelity policy will not defeat coverage absent a showing of substantial prejudice, unless the policy contains a forfeiture clause for noncompliance or express language making notice a condition precedent to recovery. *See First Nat'l Bank of Louisville v. Lustig,* 961 F.2d 1162, 1168 (5th Cir.1992) (Kentucky law); *Oritani Sav. & Loan v. Fidelity & Deposit Co.,* 744 F.Supp. 1311, 1317 (D.N.J.1990) (New Jersey law); *Security Nat'l Bank of Kansas City v. Continental Ins.,* 586 F.Supp. 139, 150 (D.Kan.1982) (Kansas law); *Columbia Union Nat'l Bank v. Hartford Accident & Indem. Co.,* 496 F.Supp. 1263, 1275–76 (W.D.Mo.1980) (Missouri law), *aff'd,* 669 F.2d 1210 (8th Cir.1982); *In re Lloyd Sec., Inc.,* 153 B.R. at 683 (Pennsylvania law); *Downey Sav. & Loan Assoc. v. Ohio Cas. Ins. Co.,* 189 Cal.App.3d 1072, 234 Cal.Rptr. 835, 843 (Ct.App.1987), *cert. denied,* 486 U.S. 1036, 108 S.Ct. 2023, 100 L.Ed.2d 610 (1988); *Miami Nat'l Bank v. Pennsylvania Ins. Co.,* 240 So.2d 832, 833 (Fla.Dist.Ct.App.1970); *Hartford Accident & Indem. Co. v. Hattiesburg Hardware Stores, Inc.,* 49 So.2d 813, 819 (Miss.1951); *see also* Couch, § 49:237–38. *But see,* Annotation, *Effect of Failure to Give Notice, or Delay in Giving Notice of Filing of Proofs of Loss, Upon Fidelity Bond or Insurance,* 23 A.L.R.2d 1065 (1952 & 1994 Supp.) (citing cases holding that noncompliance with notice provisions automatically relieves insurer of liability without showing of prejudice). The modern trend is to require insurers to show prejudice in order to avoid policy coverage for noncompliance with certain notice provisions. *See* Annotation, *Modern Status of Rules Requiring Liability Insurer to Show Prejudice to Escape Liability Because of Insured's Failure or Delay in Giving Notice of Accident or Claim, or in Forwarding Suit Papers,* 32 A.L.R.4th 141, 157 (1984) (noting that modern trend is to require a showing of prejudice by liability insurers). All the jurisdictions specifically noted above, except Florida, *see Miami Nat'l Bank,* 240 So.2d at 833, also hold that the insurer bears the burden of showing it was materially prejudiced by noncompliance with notice provisions.

As we stated earlier, the bonds at issue here do not expressly make notice within a specified time a condition precedent to recovery. Nor do they contain a forfeiture or cancellation clause in the event of noncompliance with notice provisions. This fact makes the current case distinguishable from many of the cases that hold late notice automatically relieves an insurer of liability. *Cf. Kansas Bankers,* 963 F.2d at 294 (no showing of prejudice required where fidelity bond expressly states that no rights exist under policy if proof of loss not received prior to policy termination or cancellation and consequences of noncompliance clearly defined). Courts have often noted the critical distinction between policies which explicitly make timely notice a condition precedent to recovery and those that omit such express provisions. *See, e.g., id.; J.I. Corp. v. Federal Ins. Co.,* 920 F.2d 118, 120 (1st Cir.1990); *MGIC Indem. Corp. v. Central Bank of Monroe,* 838 F.2d 1382, 1387 (5th Cir.1988).

■ In light of this substantial authority from other jurisdictions and the Utah rule that insurance "[p]rovisions excluding coverage are ... strictly construed against the insurer," *Home Sav. & Loan,* 817 P.2d at 348, we are convinced Utah would adhere to the rule which requires a fidelity insurer to show it suffered substantial prejudice from late notice where the policy contains no forfeiture clause and does not expressly condition coverage on strict fulfillment of the notice requirements.[19] We therefore hold that

---

18. American relies on *Anderson* for the proposition that Utah does not require a showing of prejudice where notice is not timely. This case is far from dispositive, however, because the notice of loss issue was not before the court and was only discussed in dicta. Furthermore, the policy at issue in *Anderson* was not a fidelity bond, and in any event, the insurance policy in that case contained a forfeiture clause in the event of noncompliance with policy provisions.

19. The Utah legislature has decided that "[f]ailure to give notice or file proof of loss ... does not bar recovery under the [insurance] policy if

the district court did not err in requiring American to show it was prejudiced by the late notice for both the MGIC and American bonds.

■ American asserts alternatively that the district court applied the wrong prejudice test. The court ruled that American could show prejudice by presenting "evidence that (1) its ability to investigate the claim has been lost; or (2) opportunities to negotiate settlement have been lost; or (3) opportunities to defend have been lost." Aplt. App., vol. I, at 288. American argues the correct test is that "prejudice exists if there were steps an insurer *could have taken* which *may have changed* the result." Aplt. Reply Br. at 19 (emphasis added).[20]

■ The question of prejudice should be evaluated in light of the purposes of notice requirements, namely to enable the insurer to investigate and take the necessary steps to protects its interests. *R. Keeton, Insurance Law* 445–447 (1971) (*Keeton*); *Couch,* § 49:212, at 411. In the fidelity bond context, prompt notice will often permit the insurer to take steps to prevent further losses based on the fraudulent activities of covered employees. *Keeton,* at 445–46; *see also FDIC v. Aetna Cas. & Sur. Co.,* 744 F.Supp. 729, 734 (E.D.La.1990). Lack of timely formal notice will not always result in prejudice, however, as the insurer may receive actual notice through other means, *see, Aetna Casualty,* 744 F.Supp. at 734 (no prejudice where insurer had notice of employee malfeasance

from copy of lawsuit filed by FDIC), or the insurer may simply fail to present adequate evidence of prejudice, *see, e.g., Oritani Sav. & Loan,* 744 F.Supp. at 1318 (no triable issue as to prejudice under fidelity bond where insurer failed to come forward with evidence of appreciable prejudice); *Thompson v. Grange Ins. Assoc.,* 34 Wash.App. 151, 660 P.2d 307, 314 (in uninsured motorist claim where insured delayed five years in presenting claim and statute of limitations barred any suit against tortfeasor, no actual prejudice due to lack of adequate evidence from insured), *review denied,* 99 Wash.2d 1011 (1983). In summary, we think the test used by the district court requiring American to show prejudice in its "ability to investigate, settle or defend the claims at issue", Aplt. App., vol. I, at 205, is sufficiently broad to ' encompass the considerations we noted above, and that it adequately states a proper test for determining prejudice. We decline to accept the test proposed by American.[21]

■ Finally, we are asked to decide if the district court erred by concluding that American did not suffer prejudice as a result of untimely notice. The question of prejudice arising from failure to provide timely notice is generally a question of fact. *See MAPCO Alaska Petroleum v. Central Nat'l Ins. Co.,* 795 F.Supp. 941, 950 (D.Alaska 1991); *Columbia .Union Nat'l Bank,* 496 F.Supp. at 1275. Based on findings that American failed to investigate improprieties at State Savings after having acquired actual

the insurer fails to show it was prejudiced by the failure." Utah Code Ann. § 31A–21–312(2) (1985). While we do not retroactively apply this statute to the case at hand, we believe it supports our decision.

**20.** American cites *Columbia Union Nat'l Bank v. Hartford Accident & Indem. Co.,* 669 F.2d 1210 (8th Cir.1982), as authority for its claim that prejudice is established under a fidelity bond if there are steps the insurer could have taken which may have changed the result. We read this case differently. The court in *Columbia Union* conclusively stated that earlier notification "would ... have allowed [the insurer] to minimize its potential loss." *Id.* at 1214. We think the *Columbia Union* court based its holding on a concrete finding of prejudice and not the mere presumption that late notice is equivalent to prejudice.

**21.** Adopting American's suggestion that prejudice is established "when there were steps that [the insurer] *could have taken* which *may have changed* the result," Aplt. Br. at 39 (emphasis added), would effectively alter our holding that the insurer must prove substantial prejudice to avoid coverage. Under American's standard, late notice would create a presumption of prejudice in almost every instance, thus relieving the insurer of its burden of proving it actually suffered material prejudice from the delay in notice. *See Scottsdale Ins. v. American Empire Surplus Lines,* 791 F.Supp. 1079, 1082–83 (D.Md.1992) (evidence that notice of suit received four years after suit filed, on eve of trial, and after settlement negotiations began does not, by itself, satisfy requirement of "actual prejudice"). We have explicitly chosen not to adopt such a presumption in this case.

notice of the dubious nature of the Park Glen transaction in May and June through newspaper articles, the district court concluded that American suffered no prejudice under either bond. *Columbia Union Nat'l Bank,* 496 · F.Supp. at 1275.

■ American argues that late notice of the January 30 wire transfer of $10 million prevented that transaction from being reversed and also permitted the March 30 transfer to be completed when it otherwise would have been stopped. To determine if American was prejudiced by untimely notice, it is necessary to first know when the insured was required to give notice of loss. Discovery of loss is the event that triggers the notice requirements. Discovery of loss as to Burgardt occurred under the American bond no later than June 1984. Aplt. App., vol. I, at 210. Under the terms of the American bond, notice of loss is due "[a]t the earliest practicable moment, not to exceed thirty days, after discovery of loss." Aplt. App., vol. III, at 1184. Consequently, notice was officially required sometime in July. The district court apparently reasoned that because American had actual notice of the questionable nature of the Park Glen transaction in May and June but failed to take steps to investigate or otherwise protect its interests, American suffered no prejudice even though it did not receive official notice until April 1985.[22] If our review were limited to the American bond, we could reach a decision as to the propriety of the district court's ruling. Our review of the district court's conclusion is complicated, however, by

the fact that American is the insurer under both the American and the MGIC bonds. We must examine both bonds' notice requirements to determine if American suffered prejudice.[23]

Like the American bond, discovery of loss is the triggering event for notice under the MGIC bond, which provides that notice is due "[a]t the earliest practicable moment after discovery" of loss. *Id.* at 1152. As we have previously discussed, *supra* at II.B.2, we can not ascertain from this record who discovered the loss as to Rossetti, when it was discovered, or whether the court relied on the adverse domination theory proposed by the FDIC when it made its ruling. Without knowing the basis of the court's decision, we can not adequately review the court's ruling that American suffered no prejudice from untimely notice. Accordingly, in light of our remand as to discovery of loss under the MGIC bond, we also remand for further consideration the issue of prejudice.

### D. Automatic Termination

■ Both bonds at issue in this appeal provide for termination of coverage as to any employee "as soon as any Insured, or any director or officer *not in collusion with such person,* shall learn of any dishonest or fraudulent act committed by such person." Aplt. App., vol. III, at 1186 (emphasis added).[24] The wire transfers at the heart of the FDIC's case against Burgardt occurred on March 30, 1984. The case against Rossetti hinges on his conduct involving wire trans-

---

**22.** The actual findings of the district court are as follows:

148. On or about May 7, 1984, [American] learned, through a *Wall Street Journal* article, that regulatory authorities were scrutinizing the Park Glen transaction.

149. On or about June 8, 1984, further information concerning the Park Glen transaction, set forth in a *Wall Street Journal* article, came to the attention of [American].

150. [American] performed no independent investigation at that time to determine whether a covered loss within the meaning of the respective bonds had been sustained by State Savings.

151. On the same date as the [June 8, 1984] *Wall Street Journal* article, [American] purported to cancel the MGIC bond ... for which it had assumed claims responsibility.

152. On July 2, 1984, [American] issued a Savings and Loan Blanket Bond to State Savings. According to the face page of the policy, its [coverage was retroactive to] February 6, 1984.

Aplt. App., vol. I, at 205–06.

**23.** State Savings was insured under the MGIC bond when the January 31 wire transfer occurred and under the American bond when the March 30 closing of Park Glen resulted in the second wire transfer.

**24.** The quoted language is from the American bond. The MGIC bond uses slightly different language, but any difference is not at issue in this appeal.

fers on both January 31 and March 30, 1984. By the explicit terms of the bonds, the automatic termination provisions would only apply if a non-colluding person learned of Rossetti's or Burgardt's dishonest or fraudulent acts prior to March 30, the latest date of the relevant transactions in this case.

Relying in part on the district court's pretrial ruling that loss sustained as a result of Rossetti's acts had been discovered under both bonds, American contends that the bonds automatically terminated as to Rossetti and Burgardt upon this discovery. American also argues that both Rossetti and Burgardt acted dishonestly with respect to several IMI brokered loan transactions prior to Park Glen, and that the discovery of such dishonesty automatically terminated coverage under the bonds. Despite our remand on the issue of discovery as to Rossetti, we can still decide the automatic termination issue because of the district court's specific findings of fact.

The court found as a matter of fact after trial that "[American] has not shown that a person not in collusion with Rossetti learned of Rossetti's dishonest conduct prior to March 30, 1984." Aplt.App., vol. I, at 206.[25] American argues the court's ruling is erroneous because both Rossetti and Burgardt were involved in several IMI brokered loan transactions prior to Park Glen. It contends that the court's finding that both men acted fraudulently and dishonestly in relation to Park Glen implies by necessity that they also acted dishonestly in relation to the prior brokered loans. American asserts that because certain individuals "knew" of Rossetti's and Burgardt's dishonest actions with respect to these prior loans, there was no collusion and that bond coverage should have terminated upon discovery of their dishonest acts.

The district court found that the prior loans referred to by American were *negligently* underwritten and constituted a departure from prudent lending practices. *Id.* at 162–63, 168–69, 172–73, 177–78, 181. The court did not find fraud or dishonesty on the

part of anyone, much less Rossetti or Burgardt, with respect to these earlier loan transactions. Nevertheless, American argues that the "dishonesty" that triggers the automatic termination provisions is less burdensome than the dishonesty needed to invoke coverage under the bonds. *Compare, Lustig,* 961 F.2d at 1168–69 (standards are not the same) *with In re Conticommodity Serv., Inc., Sec. Litig.,* 733 F.Supp. 1555, 1579 (N.D.Ill.1990) (standards are the same). We need not decide whether the dishonesty standard is different for different bond provisions because, even assuming that Rossetti did act dishonestly with regard to any of these prior loans, American has failed to show why we should reverse the district court's finding of collusion. American simply says that other individuals "knew" of Rossetti's involvement in the loans prior to January 31, 1984. It does not argue that these individuals were not in collusion with Rossetti. Indeed, American admits that the two people it names specifically worked on the same loan transactions with Rossetti. Aplt. Br. at 36. If anything, this admission supports the district court's finding of collusion. *See Adair State Bank v. American Cas.,* 949 F.2d 1067, 1076 (10th Cir.1991) (vice president's silence after learning of chairman of board's check kiting scheme sufficient to uphold finding of collusion).

While American may view the evidence differently than the district court, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We hold that the court's finding of collusion is not clearly erroneous. American's argument that the bonds automatically terminated as to Rossetti and Burgardt therefore fails.

### III.

#### A. Affirmative Defenses

American asserted below as affirmative defenses misrepresentation and the alter ego

---

**25.** Because Burgardt and Rossetti worked together on the Park Glen transaction, it is evident from the court's ruling that Burgardt was in

collusion with Rossetti. *See Adair State Bank v. American Cas.,* 949 F.2d 1067, 1076 (10th Cir. 1991).

doctrine. It claimed that State Savings made material misrepresentations in its application for the American bond by stating that it was not aware of any dishonest employees.[26] Because of this misrepresentation in the bond application, American argued it was entitled to rescission of its bond. In addition, American contended the alter ego doctrine prevents recovery where the wrongdoer, in this case Oldenburg, would benefit from recovery under the bond.

The FDIC moved to strike both defenses, contending they were barred by the doctrine articulated in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its statutory counterpart, 12 U.S.C. § 1823(e). A defense affected by section 1823(e) is governed by federal law. *See, e.g., Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). In a ruling from the bench, the district court held that *D'Oench* and section 1823(e) bar American from presenting evidence of these defenses. Aplt. App., vol. IX, at 3826. American appeals this ruling of law, which we review *de novo*.

When the FDIC acquires assets such as promissory notes or securities from a failed bank in the course of a purchase and assumption transaction and attempts to collect on such assets, it is often faced with defenses that the obligor of the asset had against the failed bank. *See FDIC v. Bank of Boulder*, 911 F.2d 1466, 1469–71 (10th Cir.1990) (en banc) (discussing mechanics of purchase and assumption transaction), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). Many such defenses involve claims of misrepresentation or "secret agreements" between the bank and the obligor that are not present on the face of the asset itself. *See Oklahoma Radio Assocs. v. FDIC*, 987 F.2d 685, 690–92 (10th Cir.1993) (discussing origin and development of *D'Oench* doctrine). In an effort to shield the FDIC from such defenses, the Supreme Court held in

*D'Oench* that it is federal policy to protect the FDIC and the funds it administers from misrepresentation as to the value of assets in the portfolios of banks it insures or to which it makes loans. 315 U.S. at 459, 62 S.Ct. at 680. The Court declared that the maker of a demand note is estopped from asserting as a defense against the FDIC the parties' "secret agreement" not to enforce the note. The court stated that because "the maker lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled," his defense was barred against the FDIC. *Id.* at 460, 62 S.Ct. at 681.

The common-law doctrine articulated in *D'Oench* was subsequently codified in 12 U.S.C. § 1823(e), which outlines strict and categorical requirements for the enforcement of certain agreements against the FDIC. Section 1823(e) provides that

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

---

26. American's argument below hinged on the fact that the trial court had already ruled that Rossetti's dishonesty had been discovered under the MGIC bond. Thus, American asserts, State Savings lied when it applied for the American bond because State Savings said it was not aware of any dishonest employees. Because we

have remanded the issue of discovery under the MGIC bond to the trial court, American's claim of misrepresentation may no longer be valid. However, assuming arguendo that there was a material misrepresentation on the application for the American bond, we address this asserted defense.

*1. Misrepresentation in bond application*

 Relying on *FDIC v. Aetna Cas. & Sur.*, 947 F.2d 196 (6th Cir.1991), American argues that *D'Oench* and section 1823(e) do not apply to the fidelity bond in question because the bond is not an "asset" of the bank and because there was no collateral or secret agreement affecting the interest of the FDIC. According to American, the only agreement was to answer questions in the bond application truthfully.[27] The FDIC points to numerous cases for the proposition that a fidelity bond is an "asset" of the bank. It also contends that nothing in the bond itself predicates payment under the bond upon the truthfulness of assertions made in the bond application. The objectionable "agreement" in this case, according to the FDIC, is that no claim will be paid under the bond if there are misrepresentations in the bond application. The FDIC argues that even if the bond application encompasses this agreement, the application is not a part of the bond itself and the application does not meet the strict requirements of section 1823(e).

While the district court did not make clear below whether it based its decision on the *D'Oench* doctrine or section 1823(e), we find reliance on section 1823(e) sufficient to affirm the district court's decision. The burden of establishing that an applicable agreement satisfies the requirements of section 1823(e) lies with American. *FDIC v. Singh*, 977 F.2d 18, 26 (1st Cir.1992); *see FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1516 (11th Cir.1984). American failed to present evidence below, and does not argue on appeal, that the bond application meets the strict requirements of section 1823(e). If we conclude that section 1823(e) applies to the bond in this case, therefore, American's misrepresentation defense will fail. We review the district court's application of section 1823(e) to the facts of this case *de novo*. *See Ute Dist. Corp. v. United States*, 938 F.2d 1157, 1161 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992).

We must first decide whether there is an "agreement" under the terms of the statute. The term "agreement" has been broadly interpreted under section 1823(e). In *Langley*, 484 U.S. 86, 108 S.Ct. 396, the Supreme Court held that misrepresentations as to existing facts can constitute agreements under section 1823(e). In that case, the Langleys attempted to avoid their obligations under a bank note owned by the FDIC by claiming that the bank had misrepresented the acreage and mineral value of a particular piece of property. The bank's representations, however, were not referenced in the documents executed by the Langleys and the court held that section 1823(e) barred the Langleys' misrepresentation defense. *Id.* at 91–93, 108 S.Ct. at 401–02.

We think the present case is analogous to *Langley*. American contends that there was an agreement here that State Savings would truthfully answer questions on the bond application. It seeks to avoid payment under *the bond* by claiming that coverage is withdrawn in the event of misrepresentations on *the bond application*. "As a matter of contractual analysis, the essence of petitioners' defense against [payment under the bond] is that the bank made certain warranties ..., the truthfulness of which was a condition to performance of their obligation [under the bond]." *Id.* at 90–91, 108 S.Ct. at 401. Yet, the conditional nature of American's obligation to pay is not stated anywhere in the bond. The bond application and the bond itself are separate documents and the bond does not condition payment on anything asserted in the application. Nor does the bond refer to the application or incorporate it by reference.

The "common meaning of the word 'agreement' must be assigned to its usage in § 1823(e) if that section is to fulfill its intended purposes." *Id.* at 91, 108 S.Ct. at 401. Given the plain language of section 1823(e) and the broad interpretation of "agreement" adopted by the Supreme Court, we hold that conditioning payment under a fidelity bond on the truthfulness of assertions in the bond

---

**27.** American asserts in its reply brief that the FDIC did not raise a section 1823(e) argument below. A review of relevant portions of the record shows this claim is without merit. *See* Aplt. App., vol. III, at 886–92.

application is an "agreement" for purposes of section 1823(e) where the bond itself does not predicate payment upon assertions made in the application, does not reference the application or incorporate it by reference, and the bond and application are separate and essentially unrelated documents.

■ Our second inquiry is whether the fidelity bond qualifies as an "asset" for purposes of the statute. We examine both the plain language of the statute as well as the policies behind it to aid our analysis. As a preliminary matter, we note that the statute says "any asset" and does not restrict section 1823(e) to negotiable instruments or other commercial paper.[28]

When a statute's plain language is unambiguous, we must apply it in accord with that patent meaning, unless the result would be 'demonstrably at odds with the intentions of its drafters.' We must ask whether the result of applying section 1823(e) literally would be "so bizarre that Congress could not have intended it."

*North Ark. Medical Ctr. v. Barrett,* 962 F.2d 780, 787 (8th Cir.1992) (citations omitted); *see Ute Distribution,* 938 F.2d at 1162.

We do not believe applying section 1823(e) to a fidelity bond is beyond the intent of Congress. The range of assets covered by section 1823(e) has increased considerably since the enactment of the statute. One court has noted that:

Contrary to [some assertions] that *D'Oench* only affects claims asserted by a maker of a note, *D'Oench* and section 1823(e) have affected monetary obligations including a mortgage, a letter of credit or personal guaranty or collateral pledge agreement securing a loan, rental payments under a lease, and a refund provi-

sion in an insurance contract. The applicability of *D'Oench* to any type of asset follows logically from the language in the *D'Oench* case about protecting the banking authority from misrepresentations as to "securities or *other assets.*" Additionally, section 1823(e)'s "any asset" language confirms that the assets covered are far broader than the narrow reading appellant offers. Federal regulatory authorities need to make reliable evaluations of the assets of a financial institution. If *any* of a bank's assets are diminished by agreements not contained in records of the bank, the regulatory authorities cannot do so.

*Twin Constr., Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 382 (11th Cir.1991) (citations omitted).

Given the unrestricted use of the words "any asset" in the statute, we are not convinced Congress meant section 1823(e) to be so narrowly interpreted as to apply to promissory notes or negotiable instruments but not fidelity bonds. The expansive language used by Congress is unambiguous and we are not persuaded application of the statute to the bond in this case will produce a result demonstrably at odds with the intention of the drafters.[29]

The transfer of "assets" in a purchase and assumption transaction from the FDIC, as receiver, to the FDIC in its corporate capacity has been construed to include "claims against [the bank's] directors and officers *and fidelity claims.*" 3 P. Alley et al., *Banking Law* § 49.11[1] (1992) (emphasis added). Courts have also viewed fidelity bonds or insurance contracts as "assets" of a bank. *See, e.g., Gulf Life,* 737 F.2d at 1515; *Belsky v. First Nat'l Life Ins. Co.,* 653 F.Supp. 80, 83–84 (D.Neb.1986) (noting that FDIC exam-

---

**28.** American asserts, in part, that the bond is not an "asset" because there was no cognizable claim in existence under the bond at the time the bank closed, and the FDIC or the bank would have to file a sworn proof of loss with full particulars before the bond is converted into an "asset" under section 1823(e). American fails to provide any support for this assertion, and we do not think Congress intended such a narrow interpretation of the word "asset" when it enacted section 1823(e). *See Aetna Casualty,* 947 F.2d at 210.

**29.** The legislative history of section 1823(e) sheds no light on the drafter's intentions for the purposes of our analysis because very little legislative history on this provision exists. *See FDIC v. Blue Rock Shopping Center,* 766 F.2d 744, 753 (3rd Cir.1985). Indeed, the legislative history of section 1823(e) does not even mention the *D'Oench* case. *See* H.R.Rep. No. 2564, 81st Cong., 2d Sess. (1950), *reprinted in* 1950 U.S.C.C.A.N. 3765, 3774; *see also FDIC v. McClanahan,* 795 F.2d 512, 514 n. 1 (5th Cir. 1986).

iner viewed life insurance policies as general asset of bank and holding that policy is asset for purposes of section 1823(e)), *aff'd on other grounds*, 818 F.2d 661, 662 n. 2 (8th Cir.1987) (declining to reach section 1823(e) issue); *FDIC v. Hartford Accident & Indem. Co.*, 106 F.Supp. 602, 603 (E.D.Mo.1952) (bank's fidelity bond one of "assets" purchased by FDIC when bank closed), *aff'd*, 204 F.2d 933 (8th Cir.1953); *Minichello v. Saxon*, 266 F.Supp. 279, 284, 286 (M.D.Pa. 1967) (assets of bank which comptroller and bank examiner considered in determining if financial emergency existed included employee fidelity bond and excess bond), *aff'd*, 394 F.2d 715 (3rd Cir.1968).

In *Gulf Life*, 737 F.2d 1513, the FDIC acquired two group creditor life insurance policies issued by Gulf Life after two separate banks failed. The FDIC brought suit against Gulf Life seeking a refund, pursuant to the contract terms, of 100% of unearned premiums on several hundred prematurely terminated loans. Gulf Life argued that it was only responsible for refunding 35% of the unearned premiums because in actual practice it had only received from the banks 35% of the premiums originally collected. The court applied section 1823(e) and barred Gulf Life's defenses of account stated, account settled, and accord and satisfaction because Gulf Life did not present any evidence meeting section 1823(e)'s strict requirements. *Id.* at 1516. The court noted that "the [insurance] policies clearly place on Gulf Life the ultimate responsibility for paying all unearned premium refunds. In the absence of any evidence of a contrary agreement permissible under section 1823(e), the FDIC was entitled to rely on the unequivocal language of the policies." *Id.*

We recognize that the Sixth Circuit directly addressed the issue before us in *Aetna Casualty*, 947 F.2d 196, and reached a different conclusion. Two members of the three-judge panel agreed that bankers blanket bonds were not the type of asset to which section 1823(e) applies. *Id.* at 207. Judge Nelson concurred in the judgment on different grounds, but stated that he was "inclined to think that an asserted right to recover on an insurance contract can be an 'asset' under

1823(e) no less than an asserted right to recover on a negotiable instrument." *Id.* at 210.

■ We are not persuaded by the majority analysis in *Aetna Casualty*. The acquisition of fidelity bonds by banks constitutes an ordinary and conventional banking transaction. *See Thigpen v. Sparks*, 983 F.2d 644, 646–47 (5th Cir.1993) (distinguishing between "nonbanking" and "conventional" banking transactions for purposes of § 1823(e)). Indeed, federal regulations require that depository institutions desiring to be insured by the FDIC have bond coverage. *See, e.g.*, 12 C.F.R. §§ 7.5215, 563.19(a) (1992); *California Union Ins. v. American Diversified Sav.*, 948 F.2d 556, 562 (9th Cir.1991). These federal requirements provide some indication of the importance of bond coverage to the authorities responsible for managing and insuring the nation's financial institutions. We do not believe fidelity bonds are so fundamentally different from other traditional bank assets that they should be beyond the reach of section 1823(e), especially given the broad language used by Congress in this statute.

In addition, application of section 1823(e) to the fidelity bonds furthers the purposes of the statute.

> One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, and when the FDIC is deciding whether to liquidate a failed bank, or to provide financing [for a purchase and assumption transaction].

*Langley*, 484 U.S. at 91, 108 S.Ct. at 401 (citations omitted). Federal regulators expressly rely on a bank's fidelity coverage as one factor in determining whether a bank is financially capable of continuing its operations. Fidelity Bonding Claims, 5 Fed.Banking L.Rep. (CCH) ¶ 60.883A (Feb. 25, 1988) (Administrator of National Banks, Examining Bulletin 88–1). While it is true that insurance contracts, due to their conditional nature, are not as prone to instantaneous assessment as promissory notes, *see Aetna*

*Casualty,* 947 F.2d at 202, it does not logically follow that unrecorded or collateral agreements which may diminish or defeat the interest of the Corporation in fidelity bonds should therefore be exempt from coverage under the statute. Despite the conditional nature of some insurance contracts, the FDIC's evaluation of a bank's fidelity bonds both before and during the course of a purchase and assumption transaction is certainly facilitated if the acquired bonds are not subject to side agreements or collateral conditions completely beyond the scope of the bonds. "Banking examiners who inspect and evaluate the bank records reasonably expect the records of regular banking transactions to reflect *all* of the rights and liabilities of the bank regarding such regular banking transactions." *OPS Shopping Center, Inc. v. FDIC,* 992 F.2d 306, 310 (11th Cir.1993). This proposition is as applicable to fidelity bonds as it is to promissory notes and negotiable instruments.

Including fidelity bonds under section 1823(e)'s requirement that agreements be executed, recorded in the bank's records, and approved by the board of directors, also furthers the statutory purpose of preventing fraud and collusion of bank employees by ensuring deliberate consideration of certain banking transactions. *See Langley,* 484 U.S. at 92, 108 S.Ct. at 401. Just as fraudulent loans are harder to arrange if the transaction must be considered by a bank board of directors, the recording requirements of section 1823(e) make it more difficult for collusive employees to fraudulently obtain fidelity coverage from insurers based on misrepresentations in bond applications which may later be used to defeat the FDIC's claim under a bond. In this case, for example, the bond application allegedly stated that State Savings was not under investigation by banking regulators. Normally a bank's board of directors would be aware of regulatory investigations.[30] If the bond application had to be considered and approved by the board, it is more likely that such misrepresentations would be noticed and avoided.

Finally, "the overriding policy of promoting stability and confidence with respect to the nation's banking system," *Gulf Life,* 737 F.2d at 1517, strongly favors application of section 1823(e) to fidelity bonds. The FDIC attempts to enforce fidelity bonds acquired in a purchase and assumption transaction "to recoup its cash outlay and thereby minimize the loss to the insurance fund." *Bank of Boulder,* 911 F.2d at 1470. If no recovery is realized on an asset, the FDIC will generally bear the loss, and the cost of the transaction is increased. Excluding fidelity bonds from section 1823(e) would therefore undermine both the plain language of the statute as well as the larger purposes behind it.

■ In applying section 1823(e) to this case, it is irrelevant that the bond application was not "secret" or that American did not agree to participate in a scheme to fraudulently procure the bond. *See Murphy v. FDIC,* 12 F.3d 1485, 1490 (9th Cir.1993) (noting that section 1823(e) expands *D'Oench* in that it applies to any agreement, whether or not it was "secret" and regardless of the maker's participation in a scheme), *reh'g en banc granted,* 22 F.3d 903 (1994). "What matters is whether the agreement diminished the FDIC's interest in an asset acquired when it took over the bank, and whether the agreement was approved by the board of directors and properly recorded on the books and records of the bank" as required by section 1823(e). *Id.* at 1492. It is clear that the agreement here diminished the FDIC's interest in the fidelity bond and that the agreement did not meet section 1823(e)'s requirements. We hold the district court correctly ruled that section 1823(e) applies to the American bond and bars American from asserting a defense of misrepresentation to avoid coverage under the bond.

*2. Alter Ego*

■ The district court also barred American's proposed alter ego defense, ruling from the bench that it was barred by *D'Oench* and section 1823(e) because it was "based upon an implied misrepresentation concerning the direction and control of the

---

**30.** In this case, State Savings' board members concealed material information from the only outside director, Wilkinson, so he did not know

State Savings was being investigated until after the completion of the Park Glen transaction.

company." Aplt. App., vol. IX, at 3826. American contends the district court erred because the alter ego defense is not based on any "agreement" and therefore *D'Oench* does not apply.

█ We need not decide whether *D'Oench* and section 1823(e) apply to American's alter ego defense because we hold this defense is barred under principles of equity. The alter ego doctrine permits piercing the corporate veil where the stockholder and corporation have not maintained separate identities and "adherence to the corporate fiction [would] sanction a fraud, promote injustice, or lead to evasion of legal obligations." *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993). American bases its defense on its contention that the wrongdoer, Oldenburg, will benefit from recovery under the bond because he is the majority shareholder in State Savings.

█ A critical element required for the application of the alter ego defense is injustice or inequity. *Id.* at 1053; *Watson v. Watson*, 837 P.2d 1, 5 (Utah App.1992). "[T]he individual who is sought to be charged personally with corporate liability must have shared in the moral culpability or injustice...." *Greater Kansas City Roofing*, 2 F.3d at 1053. It is undisputed in this case that any benefit arising from payment under either the MGIC bond or the American bond will accrue to the FDIC in its corporate capacity, not to State Savings, Oldenburg, or any company owned by Oldenburg. Because the FDIC was not responsible for the wrongdoing at State Savings, there is no inequity in allowing it to recover under the bonds. The alter ego defense is therefore inapplicable. *See Aetna Casualty*, 947 F.2d at 209 (noting in almost identical circumstances that "equity may not mandate the application of an alter ego defense").

### B. Evidentiary Rulings

1. *Exclusion of testimony regarding regulatory review of Oldenburg's finances*

█ We review a trial court's evidentiary rulings for abuse of discretion. *Durtsche v.*

*American Colloid Co.*, 958 F.2d 1007, 1011 (10th Cir.1992). An abuse of discretion will be found only where the trial court makes " 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgement.' " *United States v. Hernandez–Herrera*, 952 F.2d 342, 343 (10th Cir.1991) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1530 (10th Cir. 1989)).

█ American asserts that the district court abused its discretion by excluding testimony of John Morris, a supervisory agent at the FHLB of Seattle. When Morris approved Oldenburg's acquisition of State Savings, he had at his disposal materials that included a cover letter of an appraisal valuing Park Glen at $32.5 million. Thus, American contends, approval by Morris and the FHLB suggests that Rossetti and Burgardt could have had a good faith belief in the value of the Park Glen transaction.[31]

The district court stated:

> I will permit you to get into evidence anything that's relied on by any of the directors that was done by the regulators *that they claim justified their conduct*, but I will absolutely not permit you to go into independent acts of the regulators and thereby attempt to show some kind of standard by them that I would apply to the directors, because that's just irrelevant.

> I'm going to judge these directors on the merits of the claim against them and on the law, but I'm not going off on a wild goose chase like that.

Aplt. App., vol. VIII, at 3731 (emphasis added). The court concluded that if the testimony of Morris had any relevance at all, it was peripheral, and that any probative value of the evidence was "outweighed by the total waste of time." Aplee. Supp. App. at 172.

█ Application of the abuse of discretion standard requires deference to the district court's superior position for viewing the

---

**31.** American seems to assert this same argument as to the testimony of Elaine Weis, Commissioner of the Utah Department of Financial Institutions, but it fails to direct us to anything in the record referring to Weis' testimony. Assuming arguendo that American has not waived its argument as to Weis' testimony, we find the district court's ruling equally dispositive as to Weis.

evidence and assessing its probative value. *United States v. Ortiz,* 804 F.2d 1161, 1164 n. 2 (10th Cir.1986). We find no abuse of discretion and affirm the court's decision to exclude Morris' testimony.

### 2. *Expert testimony*

 American claims the district court erred by denying its motion to preclude the expert testimony of Robert Foreman and George Sutton as inadequate, untimely, and prejudicial. We disagree.

 The decision to allow the testimony of experts "not described or listed in the pretrial order rests with the sound discretion of the trial judge and will not be disturbed absent an abuse of discretion." *Moss v. Feldmeyer,* 979 F.2d 1454, 1458–59 (10th Cir. 1992). To determine if the court abused its discretion we examine

> (1) the prejudice or surprise in fact of the party against whom the [ ] witnesses [testified], (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Smith v. Ford Motor Co.,* 626 F.2d 784, 797 (10th Cir.1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981).

The FDIC identified Foreman and Sutton as experts for the first time on March 14, 1990. Trial began on April 9. The FDIC disclosed both the substance and basis of the proposed testimony in its supplemental interrogatory response. It is undisputed that the FDIC did not contact either Foreman or

Sutton as possible experts until after the district court ruled on several pretrial motions on February 27, including motions for summary judgment. The FDIC contends, correctly in our view, that the district court's rulings on these dispositive motions helped define the scope of trial and, accordingly, its need for certain experts. It is also undisputed that Foreman had testified extensively in a criminal trial related to the Park Glen transaction, and that American had daily transcripts of those proceedings. Mr. Sutton was contacted as an expert only after the expert previously identified by the FDIC suddenly became unavailable.

The record reveals that American was well aware of the theories upon which the FDIC intended to proceed long before Foreman and Sutton were ever identified.[32] There is no evidence of bad faith or willfullness on the part of the FDIC, and it is undisputed that at no time prior to the beginning of trial did American ask to depose Foreman or Sutton.

Under the standard set forth in *Smith,* 626 F.2d at 797, we conclude that the district court did not abuse its discretion by allowing the FDIC to present the expert testimony of Foreman and Sutton. *See Moss,* 979 F.2d at 1459–60 (no abuse of discretion where experts identified as witnesses in pretrial order, experts identified two weeks and eight days prior to trial, and plaintiff chose not to depose one expert).

## IV.

### CROSS APPEAL

 After trial, the court entered judgment in favor of the FDIC against American on both the MGIC and the American bonds

---

32. The FDIC made it clear to American that experts would probably testify with respect to the "underwriting deficiencies and intentional misconduct [of State Savings and its employees] which form the basis of the negligence and fraud counts." Aplee. Supp. App. at 33. Foreman was listed as a possible witness in the Final Pretrial Order, Aplt. App., vol. I, at 139, and was only "called" as an expert at the April trial through the designation of his prior sworn testimony from earlier criminal proceedings. American does not contest the FDIC's assertion that it had Foreman's prior criminal testimony. *See id.* at 3803.

Sutton was the successor of Elaine Weis, former Commissioner of the Utah Department of Financial Institutions. Ms. Weis had already been deposed by American when the FDIC identified Sutton as her replacement because of her sudden and unforeseen unavailability. *Id.* at 3801.

Finally, it should be noted that the FDIC did not actually violate the terms of the Final Pretrial Order, which specifically noted that further discovery would include "[s]upplementation of interrogatory responses with respect to expert testimony," and that other witnesses should be identified "at least 10 days prior to trial." Aplt. App., vol. I, at 142, 144.

for a total of six million dollars. The court declined to award the FDIC prejudgment interest. The FDIC contends that, because the loss exceeded the amount of policy coverage and was capable of calculation with mathematical certainty, it was entitled to prejudgment interest from approximately December 21, 1985, the date that the FDIC's claim against American accrued.

 Under Utah law, a trial court's decision on "entitlement to prejudgment interest presents a question of law." *Andreason v. Aetna Cas. & Sur. Co.,* 848 P.2d 171, 177 (Utah App.1993). Prejudgment interest is awarded where "the loss [has] been fixed as of a definite time and the amount of the loss can be calculated with mathematical accuracy in accordance with well-established rules of damages." *Bellon v. Malnar,* 808 P.2d 1089, 1097 (Utah 1991). Because the district court's rulings on remand may affect the judgment under both the American and MGIC bonds, the issue of prejudgment interest under both bonds must be considered anew on remand.

## V.

### CONCLUSION

In sum, we affirm the district court's determinations that Burgardt acted with manifest intent, that discovery of loss occurred under the American bond, that prejudice is required to avoid coverage because of untimely notice, that the automatic termination provisions of the bonds do not apply to terminate coverage, and that 12 U.S.C. § 1823(e) applies to bar American's misrepresentation defense. We reverse the district court's judgment in favor of the FDIC on the MGIC bond and remand for further proceedings in light of this opinion. We also reverse the court's judgment in favor of the FDIC on the American bond and remand for reconsideration of the prejudice issue. Finally, we remand the issue of prejudgment interest.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.